IN THE UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA CIRCUIT

**STATE OF NEW JERSEY, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF WASHINGTON, and the DISTRICT OF COLUMBIA,**

Case No. 21 - 1033 .

Petitioners,

v.

**UNITED STATES ENFIRONMENTAL PROTECTION AGENCY; and ANDREW R. WHEELER, in his official capacity as Administrator of the United States Environmental Protection Agency,**

Respondents.

## PETITION FOR REVIEW

Pursuant to Clean Air Act § 307(b)(1), 42 U.S.C. § 7607(b)(1), Rule

15 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rule 15, the

States of New Jersey, Maryland, Minnesota, Oregon, Washington, the

Commonwealth of Massachusetts, the Commonwealth of Pennsylvania, and

the District of Columbia (collectively, the "Petitioners"), petition this Court

to review the United States Environmental Protection Agency's final action

entitled "Prevention of Significant Deterioration (PSD) and Nonattainment

New Source Review (NNSR): Project Emissions Accounting," published at 85 Fed. Reg. 74,890 (Nov. 24, 2020). A copy of the rule is attached hereto as Attachment A.

Dated: January 19, 2021       Respectfully Submitted,

FOR THE STATE OF NEW JERSEY
GURBIR GREWAL
ATTORNEY GENERAL

*/s/ Lisa J. Morelli*
LISA J. MORELLI
DEPUTY ATTORNEY GENERAL
NEW JERSEY DIVISION OF LAW
25 MARKET STREET
TRENTON, NEW JERSEY 08625
Tel: (609) 376-2745
Email: Lisa.Morelli@law.njoag.gov
*COUNSEL FOR THE STATE OF NEW JERSEY*

| FOR THE STATE OF MARYLAND | FOR THE COMMONWEALTH OF MASSACHUSETTS |
|---|---|
| BRIAN E. FROSH | MAURA HEALEY |
| ATTORNEY GENERAL OF MARYLAND | ATTORNEY GENERAL OF MASSACHUSETTS |
| */s/ Joshua M. Segal* | */s/ Carol Iancu* |
| JOSHUA M. SEGAL | CAROL IANCU |
| SPECIAL ASSISTANT | ASSISTANT ATTORNEY GENERAL |
| ATTORNEY GENERAL | OFFICE OF THE ATTORNEY GENERAL |
| OFFICE OF THE | ENVIRONMENTAL PROTECTION DIVISION |
| ATTORNEY GENERAL | ONE ASHBURTON PLACE, 18TH FL |
| 200 ST. PAUL PLACE | BOSTON, MA 02108 |
| BALTIMORE, MD 21202 | (617) 963-2428 |
| (410) 576-6446 | *Carol.Iancu@mass.gov* |
| jsegal@oag.state.md.us | *COUNSEL FOR THE COMMONWEALTH OF* |
| *COUNSEL FOR THE STATE OF MARYLAND* | *MASSACHUSETTS* |

FOR THE STATE OF MINNESOTA

KEITH ELLISON
ATTORNEY GENERAL OF MINNESOTA

/s/ Peter Surdo
PETER SURDO
SPECIAL ASSISTANT
ATTORNEY GENERAL
MINNESOTA OFFICE OF THE
ATTORNEY GENERAL
445 MINNESOTA STREET SUITE 900
SAINT PAUL, MN 55101-2127
(651) 757-1061
peter.surdo@ag.state.mn.us
COUNSEL FOR THE STATE OF
MINNESOTA

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
ATTORNEY GENERAL OF OREGON

/s/ Paul Garrahan
PAUL GARAHAN
ATTORNEY-IN-CHARGE
STEVE NOVICK
SPECIAL ASSISTANT
ATTORNEY GENERAL
NATURAL RESOURCES SECTION
OREGON DEPARTMENT OF JUSTICE
1162 COURT STREET NE
SALEM, OR 97301-4096
(503) 947-4593
paul.garrahan@doj.state.or.us
steve.novick@doj.state.or.us
COUNSEL FOR THE STATE OF OREGON

FOR THE COMMONWEALTH OF
PENNSLYVANIA
JOSH SHAPIRO
ATTORNEY GENERAL
MICHAEL J. FISCHER
CHIEF DEPUTY ATTORNEY GENERAL

/s/ Ann R. Johnston
ANN R. JOHNSON
SENOR DEPUTY ATTORNEY GENERA
OFFICE OF THE ATTORNEY GENERAL
STRAWBERRY SQUARE
HARRISBURG, PA 17120
(717) 857-2091
ajohnston@attorneygeneral.gov
COUNSEL FOR THE COMMONWEALTH OF
PENNSYLVANIA

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
ATTORNEY GENERAL

/s/Christopher H. Reitz
CHRISTOPHER H. REITZ
ASSISTANT ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 40117
OLYMPIA, WA 98504
(360) 586-4614
chris.reitz@atg.wa.gov
ATTORNEYS FOR THE STATE OF WASHINGTON

FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE

*/s/ LOREN ALIKHAN*
LOREN L. ALIKHAN
SOLICITOR GENERAL
OFFICE OF THE ATTORNEY GENERAL FOR
THE DISTRICT OF COLUMBIA
400 6TH STREET N.W., SUITE 8100
WASHINGTON, DC 20001
(202) 727-6287
Loren.AliKhan@dc.gov

# ATTACHMENT A

**85 Fed. Reg. 74,890 (Nov. 24, 2020)**



## C. Petitions for Judicial Review

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by January 25, 2021. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action.

This action, approving the negative declarations submitted by the City of Philadelphia and the District of Columbia, certifying that there are no existing municipal solid waste landfills in the City of Philadelphia or the District of Columbia that are subject to the requirements of 40 CFR part 60 subpart Cf, may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2).)

### List of Subjects in 40 CFR Part 62

Environmental protection, Air pollution control, Intergovernmental relations, Reporting andrecordkeeping requirements.

Dated: November 2, 2020.

**Cosmo Servidio,**

*Regional Administrator, Region III.*

For the reasons stated in the preamble, the EPA amends 40 CFR part 62 as follows:

## PART 62—APPROVAL AND PROMULGATION OF STATE PLANS FOR DESIGNATED FACILITIES AND POLLUTANTS

■ 1. The authority citation for part 62 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart J—District of Columbia

■ 2. Revise § 62.2140 to read as follows:

### § 62.2140 Identification of plan—negative declaration.

Letter from the District of Columbia, Department of Energy and Environment, submitted November 15, 2019, certifying that there are no existing municipal solid waste landfills in the District of Columbia that are subject to 40 CFR part 60, subpart Cf.

### Subpart NN—Pennsylvania

■ 3. Revise § 62.9633 to read as follows:

### § 62.9633 Identification of plan—negative declaration.

Letter from the City of Philadelphia, Department of Public Health, submitted March 15, 2018 and amended by email on May 1, 2020, certifying that there are no existing municipal solid waste landfills in the City of Philadelphia that are subject to 40 CFR part 60, subpart Cf.

[FR Doc. 2020–24690 Filed 11–23–20; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 51 and 52

[EPA–HQ–OAR–2018–0048; FRL–10016–21–OAR]

RIN 2060–AT89

### Prevention of Significant Deterioration (PSD) and Nonattainment New Source Review (NNSR): Project Emissions Accounting

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is promulgating revisions to its major New Source Review (NSR) applicability regulations to clarify when the requirement to obtain a major NSR permit applies to a source proposing to undertake a physical change or a change in the method of operation (*i.e.*, a project) under the major NSR preconstruction permitting programs. Under these programs, an existing major stationary source proposing to undertake a project must determine whether that project will constitute a major modification subject to the major NSR preconstruction permitting requirements by following a two-step applicability test. The first step is to determine if the proposed project would result in a "significant emissions increase" of a regulated NSR pollutant (Step 1). If the proposed project is determined to result in such an increase, the second step is to determine if the project would also result in a "significant net emissions increase" of that pollutant from the source (Step 2). In this action, we are promulgating revisions to our major NSR applicability regulations to clarify that both increases and decreases in emissions resulting from a proposed project can be considered in Step 1 of the major NSR major modification applicability test. We refer to the consideration of emissions increases and decreases in Step 1 as project emissions accounting.

**DATES:** This final rule is effective on December 24, 2020.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID

No. EPA–HQ–OAR–2018–0048. All documents in the docket are listed in the *https://www.regulations.gov* website. Although listed in the index, some information may not be publicly available, *e.g.*, Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy. Publicly available docket materials are available electronically through *https://www.regulations.gov.*

In addition, the EPA has a website for NSR rulemakings at: *https://www.epa.gov/nsr.* The website includes the EPA's proposed and final NSR regulations, as well as guidance documents and technical information related to preconstruction permitting.

**FOR FURTHER INFORMATION CONTACT:** For further information concerning this action, please contact Jessica Montañez, U.S. EPA, Office of Air Quality Planning and Standards, Air Quality Policy Division, Mail Code C504–03, 109 T.W. Alexander Drive, Research Triangle Park, NC 27709; by telephone at (919) 541–3407 or by email at *montanez.jessica@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document, wherever "we," "us," or "our" is used, we mean the EPA and wherever "reviewing authorities," or "air agencies" is used, we mean air pollution control agencies.

## I. General Information

### A. Does this action apply to me?

Entities potentially affected directly by this action include sources in all industry categories. Entities potentially affected directly by this action also include state, local and tribal air pollution control agencies responsible for permitting sources pursuant to the major NSR programs requirements.

### B. Where can I get a copy of this document and other related information?

In addition to being available in the docket, an electronic copy of this **Federal Register** document will be posted at *https://www.epa.gov/nsr.*

### C. How is this document organized?

The information presented in this document is organized as follows:

I. General Information
    A. Does this action apply to me?
    B. Where can I get a copy of this document and other related information?
    C. How is this document organized?
II. Background
    A. The New Source Review Program

B. Major Modifications Under the NSR Program
C. Project Emissions Accounting
D. Legal Analysis and Policy Rationale
III. Final Action
  A. Summary of Final Action
  B. Comments Received and Basis for Final Action
   1. General Comments on the Proposal
   2. Revisions to Step 1 of the NSR Modification Applicability Test
   3. Legal Rationale
   4. Defining the Scope of a Project
   5. Monitoring, Recordkeeping and Reporting of Emissions Decreases in Step 1 of the NSR Major Modification Applicability Test
   6. Considering Emissions Decreases in Step 1 for Delegated and SIP-Approved Programs
   7. Environmental and Economic Impact Considerations of Project Emissions Accounting
IV. Environmental Justice Considerations
V. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
  B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs
  C. Paperwork Reduction Act (PRA)
  D. Regulatory Flexibility Act (RFA)
  E. Unfunded Mandates Reform Act (UMRA)
  F. Executive Order 13132: Federalism
  G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  H. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks
  I. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use
  J. National Technology Transfer and Advancement Act (NTTAA)
  K. Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations
  L. Congressional Review Act (CRA)
  M. Judicial Review
VI. Statutory Authority

## II. Background

On August 9, 2019, the EPA proposed[1] to revise its major NSR applicability regulations to clarify when the requirement to obtain a permit applies to an existing major stationary source proposing to undertake a physical change or change in the method of operation (*i.e.*, project) under the major NSR preconstruction permitting programs. More specifically, the EPA proposed to revise its NSR applicability regulations to make it clear that both emissions increases and decreases that result from a given proposed project are to be considered in

Step 1 of the NSR major modification applicability test in a process known as project emissions accounting.

In the subsections that follow, the EPA introduces the NSR program and summarizes information from the proposal, including: (1) What constitutes a major modification under the major NSR programs, (2) the project emissions accounting process and its place in the major modification applicability test, and (3) the legal rationale for the regulatory revisions that were proposed. The history of the EPA's treatment of emissions increases and decreases in Step 1 of the major modification applicability test, including the March 2018 Memorandum titled "Project Emissions Accounting Under the New Source Review Preconstruction Permitting Program,"[2] was provided in the notice of proposed rulemaking and will not be restated here. The public comment period for this proposed rule ended on October 8, 2019.

### A. The New Source Review Program

As established under the Clean Air Act (CAA), the NSR program is a preconstruction permitting program that requires certain stationary sources of air pollution to obtain permits prior to beginning construction. The NSR permitting program applies to both new construction and to modifications of existing sources, regardless of whether the source is in an area where the national ambient air quality standards (NAAQS) have been exceeded (nonattainment area) or if the source is in an area where the NAAQS have not been exceeded (attainment or unclassifiable area). New construction and modifications that emit "regulated NSR pollutants"[3] over certain

thresholds are subject to major NSR requirements, while smaller emitting sources and modifications may be subject to minor NSR requirements or be excluded from NSR altogether.

Major NSR permits for sources that are located in attainment or unclassifiable areas are referred to as Prevention of Significant Deterioration (PSD) permits. These permits can also cover pollutants for which there are no NAAQS. Major NSR permits for sources located in nonattainment areas and that emit pollutants above the specified thresholds for which the area is in nonattainment are referred to as nonattainment NSR (NNSR) permits. The pollutant(s) at issue and the air quality designation of the area where the facility is located or proposed to be built determine the specific permitting requirements. The CAA requires sources subject to PSD to meet emission limits based on Best Available Control Technology (BACT) as specified by CAA section 165(a)(4), and sources subject to NNSR to meet Lowest Achievable Emissions Rate (LAER) pursuant to CAA section 173(a)(2). Other requirements to obtain a major NSR permit vary depending on whether it is a PSD or NNSR permit.

A new stationary source is subject to major NSR requirements if its potential to emit (PTE) a regulated NSR pollutant exceeds statutory emission thresholds.[4] If it exceeds the applicable threshold, the NSR regulations define it as a "major stationary source."[5]

An existing major stationary source triggers major NSR permitting requirements when it undergoes a "major modification." The EPA's implementing regulations for NSR establish a two-step process for determining major NSR applicability for projects at stationary sources. To be subject to major NSR requirements, the project must result in both (1) a significant emissions increase from the project (the determination of which is

---

[2] Letter from E. Scott Pruitt, to Regional Administrators, "Project Emissions Accounting Under the New Source Review Preconstruction Permitting Program," March 13, 2018 ("March 2018 Memorandum") available at: *https://www.epa.gov/sites/production/files/2018-03/documents/nsr_memo_03-13-2018.pdf*. As indicated in the proposal, the March 2018 Memorandum explained that "the EPA interpreted the current NSR regulations as providing that emissions decreases as well as increases are to be considered in Step 1 of the NSR applicability process, where those decreases and increases are part of a single project." More specifically, in the March 2018 Memorandum the EPA interpreted the current major NSR regulations to mean that emissions increases and decreases could be considered in Step 1 for projects that involve multiple types of emissions units in the same manner as they are considered for projects that only involve new or only involve existing emissions units.

[3] 40 CFR 52.21(b)(50). The regulations at 40 CFR 52.21 apply to the federal PSD program. The EPA has other NSR regulations including at 40 CFR 51.165, 51.166, and Appendix S of part 51, that contain analogous provisions. This final rule also applies to those analogous provisions as well. However, there

are certain modification provisions under Title I, Subpart D of the CAA and the EPA nonattainment NSR regulations that apply to certain nonattainment area classifications. For example, CAA section182(e)(2) and 40 CFR part 51, Appendix S 11.A.5.(v). This final rule does not cover those provisions. We cite to 40 CFR 52.21 for convenience, but the regulatory revisions we are finalizing apply to other regulations as specified in the regulatory text section of this final rule.

[4] For PSD, the statute uses the term "major emitting facility" which is defined as a stationary source that emits, or has a PTE, at least 100 tons per year (tpy) if the source is in one of 28 listed source categories—or at least 250 tpy if the source is not—of "any air pollutant." CAA section 169(1). For NNSR, the emissions threshold for a major stationary source is 100 tpy, although lower thresholds may apply depending on the degree of the nonattainment problem and the pollutant.

[5] 40 CFR 52.21(b)(1)(i).

called "Step 1" of the NSR applicability analysis); and (2) a significant net emissions increase at the stationary source, taking account of emission increases and emission decreases attributable to other projects undertaken at the stationary source within a specific time frame (called "Step 2" of the NSR applicability analysis, or "contemporaneous netting"). For this two-step process, the NSR regulations define what emissions rate constitutes "significant" for each NSR pollutant.[6]

In many cases, these requirements of the major NSR program (or equivalent requirements) are formally adopted by a state or local air agency, and the agency submits a revised state implementation plan (SIP) to the EPA for approval. The EPA's regulations provide for the minimum requirements of these programs. Upon the EPA approving the SIP, the air agency becomes the "reviewing authority" for major NSR permits for sources within its boundaries. When a state or local air agency is not the permitting authority, either the EPA issues the major NSR permits or a state or local air agency issues the major NSR permits on behalf of the EPA by way of a delegation agreement. For sources located in Indian country, the EPA is currently the only permitting authority for major NSR. Currently, state and local air agencies issue the vast majority of major NSR permits each year.

New sources and modifications that do not require a major NSR permit may instead require a minor NSR permit prior to construction. Minor NSR permits are almost exclusively issued by state and local air agencies, although the EPA issues minor NSR permits in some areas of Indian country. Minor NSR requirements are approved into a SIP in order to achieve and maintain the NAAQS.[7] The CAA and the EPA's regulations are less prescriptive regarding minimum requirements for minor NSR, thus, air agencies generally have more flexibility in designing their minor NSR programs.

*B. Major Modifications Under the NSR Program*

In the proposal, the EPA explained that our NSR regulations define a major modification[8] as any physical change or change in the method of operation of an existing major stationary source that would result in a significant emissions increase of a regulated NSR pollutant[9]

(as determined in Step 1 of the NSR major modification applicability test) and a significant net emissions increase of that pollutant (as determined in Step 2 of the major modification applicability test)[10] from the major stationary source. This two-step applicability test, which has been an element of the NSR programs since the 1980's, was codified by the 2002 NSR Reform Rule[11] to explicitly include the prior EPA practice of looking first at whether any emissions increase that would result from a project[12] by itself is significant before evaluating whether there would be a significant "net emission increase"[13] from the major stationary source. In other words, Step 1 considers the effect of the project alone and Step 2 considers the effect of the project and any *other* emissions changes at the major stationary source that are contemporaneous to the project (*i.e.,* generally within a 5-year period) and creditable.

An emissions increase of a regulated NSR pollutant is considered significant if the emissions increase in Step 1 or 2, would be equal to or greater than any of the pollutant-specific Significant Emissions Rates (SERs) listed under the definition of "significant" in the applicable PSD or NNSR regulations.[14] The SERs in the existing NSR regulations are based on an EPA determination that increases in emissions below these levels are *de minimis* and thus need not be subject to major NSR permitting. For those regulated NSR pollutants not specifically listed, *any* increase in emissions is significant.[15] In addition,

the procedure for calculating whether a proposed project would result in a significant emissions increase depends upon the type of emissions unit(s)[16] that would be included in the proposed project. The emissions units involved in a project can be new, existing, or a combination of new and existing units (*i.e.,* multiple types of emissions units).[17] For new units,[18] the NSR regulations require the difference in pre- and post-project emissions to be calculated based on the difference between a unit's baseline actual emissions (as applicable to new emissions units)[19] and its potential to emit[20] after the project. For existing units,[21] the NSR regulations require that the difference in pre- and post-project emissions be calculated based on the difference between a unit's baseline actual emissions (as applicable to existing emissions units)[22] and its projected actual emissions[23] after the project. Baseline actual emissions for new units are based on the units' potential to emit before the project.[24] Potential to emit represents a unit's maximum capacity to emit a pollutant under its physical and operational design. Baseline actual emissions for existing units are determined based on the rate of actual emissions (in tons per year) a unit has emitted in the past. Projected actual emissions for existing units are determined based on the maximum rate of actual emissions (in tons per year) a unit is projected to emit in the future.

Once a source determines that a significant emissions increase would occur in Step 1, then the source may deem the project to be a major

---

[6] 40 CFR 52.21(b)(23).

[7] CAA section 110(a)(2)(C).

[8] 40 CFR 52.21(b)(2).

[9] "Regulated NSR pollutant" is defined at 40 CFR 52.21(b)(50). A "regulated NSR pollutant" includes

any pollutant for which a NAAQS has been promulgated and other pollutants such as sulfuric acid mist and hydrogen sulfide, among others.

[10] The NSR major modification applicability test is described in 40 CFR 52.21(a)(2)(iv)(a).

[11] In 2002, the EPA issued a final rule that revised the regulations governing the major NSR program. The agency refers generally to this rule as the "NSR Reform Rule." As part of this 2002 rule, the EPA revised the NSR applicability requirements for modifications to allow sources more flexibility to respond to rapidly changing markets and plan for future investments in pollution control and prevention technologies. 67 FR 80185 (December 31, 2002).

[12] 40 CFR 52.21(b)(52). We use the term "project" to mean the physical change or change in method of operation under review, though this can encompass one or more activities at an existing major source. A subsequent section of this rule's preamble discusses how multiple activities should be evaluated to determine whether these activities constitute one project.

[13] 40 CFR 52.21(b)(3).

[14] 40 CFR 52.21(b)(23) defines when emissions of listed pollutants are considered significant under the federal PSD program. These pollutants include, but are not limited to, the following: Pollutants for which a NAAQS has been promulgated, fluorides, and sulfuric acid mist.

[15] 40 CFR 52.21(b)(23)(ii). Per 40 CFR 52.21(b)(23)(iii), *significant* also means any

emissions rate or any net emissions increase associated with a major stationary source or major modification, which would construct within 10 kilometers of a Class I area, and have an impact on such area equal to or greater than 1 μg/m³, (24-hour average).

[16] 40 CFR 52.21(b)(7). There are two types of emissions units, new and existing. A "replacement unit" as defined in the NSR regulations is an existing emissions unit.

[17] 40 CFR 52.21(a)(2)(iv).

[18] 40 CFR 52.21(b)(7)(i). The NSR regulations define a "new emissions unit" as "any emissions unit that is (or will be) newly constructed and that has existed for less than two years from the date such emission unit first operated."

[19] 40 CFR 52.21(b)(48)(iii).

[20] 40 CFR 52.21(b)(4).

[21] 40 CFR 52.21(b)(7)(ii).

[22] 40 CFR 52.21(b)(48)(i) and (ii).

[23] 40 CFR 52.21(b)(41). A source may elect to use the potential to emit for the emissions unit in lieu of projected actual emissions as provided by 40 CFR 52.21(b)(41)(ii)(d).

[24] The "baseline actual emissions for purposes of determining the emissions increase that will result from the initial construction and operation of such unit shall equal zero; and thereafter, for all other purposes, shall equal the unit's potential to emit." 40 CFR 52.21(b)(48)(iii).

modification or perform the Step 2 contemporaneous netting analysis to determine if there would be a significant net emissions increase at the major source and thus be subject to major NSR permitting.[25] A net emissions increase means, with respect to any regulated NSR pollutant emitted at a major stationary source, the amount by which the sum of the following exceeds zero: (a) [t]he increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to [40 CFR 52.21](a)(2)(iv); and (b) [a]ny other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable.[26] The Step 2 contemporaneous netting analysis is conducted by adding the emissions increase [27] from the project as determined in Step 1 to all *other* increases and decreases in actual emissions at the major stationary source that are contemporaneous with the project and otherwise creditable.

Emissions increases and decreases are contemporaneous if they occur between "[t]he date 5 years before construction on the particular change commences; and [t]he date that the increase from a particular change occurs." [28] An increase or decrease in actual emissions in Step 2 is creditable only if the EPA Administrator or other reviewing authority has not relied on it in issuing a PSD or NNSR permit for the source and the permit is still in effect at the time the major modification occurs.[29] Furthermore, emissions increases in Step 2 are only creditable if the new level of actual emissions exceeds the old level of actual emissions.[30] Emissions decreases in Step 2, on the other hand, are creditable only to the extent that the old level of actual emissions or the old level of allowable emissions, whichever is lower, exceeds the new level of actual emissions and the decrease in actual emissions is enforceable as a practical matter at and after the time that actual construction of the particular change begins.[31] In nonattainment areas, emissions reductions are also only creditable if they have not been relied upon for demonstrating attainment or reasonable further progress.[32]

A project that results in a significant emissions increase in Step 1 and a significant net emissions increase in Step 2 of the NSR major modification applicability test is a major modification that requires a major NSR permit.

## C. Project Emissions Accounting

As we stated in the March 2018 Memorandum, in 2017 the EPA "identified certain elements of the NSR regulations and associated EPA policies that have been sources of confusion and uncertainty" for both permitting authorities and stakeholders alike.[33] One such element was "whether emissions decreases from a proposed project at an existing major stationary source may be taken into account under Step 1 of the major modification applicability process in the EPA NSR regulations." [34] Thus, in the Memorandum, we communicated that after review of past regulatory interpretations and the existing regulations as whole, we interpret our "current NSR regulations [to] provide that emissions decreases as well as increases are to be considered at Step 1 of the NSR applicability process, provided they are part of a single

project" [35] in the process known as "project emissions accounting."

A project can involve new, existing, or a combination of new and existing units. Before the March 2018 Memorandum, there was uncertainty and confusion on whether both increases and decreases could be considered at Step 1 for all types of emissions units because of a slight variation in the regulatory text used for the NSR major modification applicability test that applies to projects that involve a combination of new and existing units (*i.e.*, hybrid test) as compared to the major modification applicability tests that apply to only new or only existing units. As we explained further in the March 2018 Memorandum and in this rule's proposal, the regulatory text for new units and existing units use the phrase "sum of the difference," while the hybrid test used the phrase "sum of the increases." In the March 2018 Memorandum, the EPA determined, after a review of past regulatory interpretations and the existing regulations as whole, that the best reading of our regulations is that both increases and decreases in emissions could be accounted for at Step 1 for all three types of emissions units under their respective NSR major modification applicability tests. However, recognizing the uncertainty described previously the proposal included revised regulatory text to clarify the regulations that define the major modification applicability test as it applies to projects involving multiple types of emissions units.[36] The proposed regulatory textmade clear that emissions increases and decreases for projects that involve multiple types of emissions units can be considered in the same manner as emissions increases and decreases for projects that only involve new units or only involve existing units in Step 1 of the NSR major modification applicability test. The regulatory text that governed this hybrid test prior to the finalization of this rule said that "a significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the emissions increases for each emissions unit, using the method specified in [40 CFR 52.21](a)(2)(iv)(*c*) [37] through (*d*) [38] . . . as applicable with respect to each emissions unit, for each type of emissions unit equals or exceeds the significant amount

[25] Step 2, which is also known as contemporaneous netting, is voluntary and can add complexity to the NSR major modification applicability process in that it requires the additional accounting of all other increases and decreases in actual emissions that are contemporaneous to the project and creditable. This includes accounting of all creditable increases and decreases in emissions over the five-year period prior to the commence construction date for the project, regardless of whether those increases and decreases were associated with air permitting actions for which records would be readily available. It also requires that the source anticipate and include in the netting analysis any creditable increases or decreases in emissions that may occur after the commence construction date for the project and prior to the date the increase from the project is expected to occur, which can range from months to years. 40 CFR 52.21(b)(3)(i)(b). In aggregate, this accounting can span well over five years and involve many emissions units at large, complex sources. Additionally, to be creditable, emissions decreases accounted for in Step 2 must, among other things, be enforceable as a practical matter at and after the time actual construction on the project being evaluated in Step 1 begins, which may require one or more additional permitting actions to establish such enforceable emission limits. 40 CFR 52.21(b)(3)(vi)(b). If a project results in a significant emissions increase in Step 1, a source may choose to forego the potentially complex and cumbersome process of conducting a contemporaneous netting analysis and subject itself to major NSR permitting requirements without conducting the Step 1 analysis.

[26] 40 CFR 52.21(b)(3).

[27] This emissions increase is the aggregate increase in emissions from the project and, thus, it includes any emissions increases and decreases from the individual emissions units that are part of the project.

[28] 40 CFR 52.21(b)(3)(ii). The contemporaneous period could be different from a 5-year time period for states with approved State Implementation Plans.

[29] 40 CFR 52.21(b)(3)(iii)(*a*).

[30] 40 CFR 52.21(b)(3)(v).

[31] 40 CFR 52.21(b)(3)(vi).

[32] 40 CFR 51.165(a)(1)(vi)(E)(3).

[33] March 2018 Memorandum at 1.

[34] *Id.*

[35] *Id.*

[36] 40 CFR 52.21(a)(2)(iv)(*f*).

[37] Actual-to-projected-actual applicability test for projects that only involve existing emissions units.

[38] Actual-to-potential test for projects that only involve construction of a new emissions unit(s).

of that pollutant." [39] Thus, in the proposal, we proposed to revise the term "sum of the emissions increases" to "sum of the difference" to mirror the text in 40 CFR 52.21(a)(2)(iv)(*c*) through (*d*) to help clarify that projects that involve multiple types of emissions units should treat the calculation of the change in emissions from the project in Step 1 of the NSR major modification applicability test in the same way as the calculations for projects that only involve new units or only involve existing units (*i.e.*, considering both emissions increases and decreases from the proposed project in Step 1). We also proposed to clarify that the revised term "sum of the difference" would apply to "all emissions units" instead of "for each emissions unit" to make clear that for projects that involve multiple types of emissions units, the source owner or operator will first calculate the "sum of the difference" for each existing unit and "sum of the difference" for each new unit according to 40 CFR 52.21(a)(2)(iv)(*c*) and (*d*) respectively, and then, the owner or operator would proceed to add the "sum of the difference" from (c) and (d) according to 40 CFR 52.21(a)(2)(iv)(*f*), the hybrid test. In the proposal, we also added regulatory text to clarify that the term "sum of the difference" as used in the referenced subparagraphs shall include both increases and decreases in emissions as calculated in accordance with those subparagraphs.

## D. Legal Analysis and Policy Rationale

In the March 2018 Memorandum, we explained that "the CAA contains no statutory definition of the term 'major modification.'" The CAA does, however, define the term "modification" as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." [40] The major NSR applicability regulations discussed previously reflect an interpretation of the statutory phrase "increases the amount of any air

pollutant emitted" that is contained in this definition of "modification" in section 111 of the CAA [41] and as cross referenced in both Part C (PSD) and Part D (NNSR) of Title I of the CAA.[42] The United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) has recognized that the CAA "is silent on how to calculate such 'increases' in emissions." [43] Thus, the question of how to determine whether a physical change or change in the method of operation "increases" emissions is ambiguous.[44] Accordingly, because the statutory text does not itself dictate how to determine whether a physical change or change in the method of operation "increases" emissions, under principles established by the Supreme Court,[45] the "EPA has the authority to choose an interpretation" of the term "increases" in "administering the NSR program and filling in the gaps left by Congress." [46] And in choosing an interpretation of the term "increases" in relation to the administration of the NSR program, "[t]here can be no doubt that the EPA is entitled to balance environmental concerns with economic and administrative concerns, at least to a point." [47]

The EPA believes that allowing for consideration of both emissions increases and decreases from a project is consistent with congressional intent for the PSD and NNSR preconstruction permitting programs to cover existing sources only when they undertake projects which result in a non-*de minimis* increase in emissions.[48] If the full scope of emissions changes from a

project were *not* considered in Step 1, the regulations could subject a project to major NSR when the *actual* effect of that project would be to reduce emissions or result in a *de minimis* increase in emissions, which would be contrary to congressional intent for this program.[49] The EPA sees little policy support for such an outcome. Allowing the consideration of both increases and decreases in emissions in Step 1 allows sources to undertake projects that may be environmentally beneficial overall and that may be forgone if emissions decreases cannot be considered in Step 1. Therefore, the EPA continues to believe a two-step process—first determining the full scope of emissions changes, both increases and decreases, from the project under consideration and second, considering any increases or decreases from other projects at the source that are contemporaneous and creditable—is a reasonable and allowable interpretation of the phrase "increases the amount of any air pollutant emitted" within the definition of "modification."

Furthermore, the EPA continues to believe this approach represents sound policy to the extent it encourages sources to undertake projects that may result in emissions decreases that might not otherwise occur or could be delayed. As stated in the proposal preamble, various sources have indicated to the EPA that they have either significantly delayed or abandoned altogether projects that could have resulted in overall emissions decreases [50] given the complexities that Step 2 contemporaneous netting can

---

[39] 40 CFR 52.21(a)(2)(iv)(*f*) (2019).

[40] March 2018 Memorandum at 3. 42 U.S.C. 7411(a)(4); CAA section 111(a)(4). This definition of "modification," originally enacted by Congress in 1970 as part of the New Source Performance Standards (NSPS) program, was incorporated by reference for purposes of the newly enacted PSD and nonattainment programs by the Clean Air Act Amendments of 1977. 42 U.S.C. 7479; CAA section 169(1)(C) ("The term 'construction' when used in connection with any source or facility includes the modification (as defined in section 7411(a) of this title) of any source or facility."); 42 U.S.C. 7501(4); CAA section 171(4) ("The terms 'modifications' and 'modified' mean the same as the term 'modification' as used in section 7411(a)(4) of this title.").

[41] 42 U.S.C. 7411(a)(4).

[42] 42 U.S.C. 7479(2)(C); 42 U.S.C.7501(4).

[43] *New York* v. *EPA*, 413 F.3d 3, 22 (D.C. Cir. 2005) (*New York I*).

[44] *New York* v. *EPA*, 443 F.3d 880, 888–89 (D.C. Cir. 2006) (*New York II*) ("Congress's use of the word 'increases' necessitated further definition regarding rate and measurement for the term to have any contextual meaning.").

[45] *Chevron U.S.A.* v. *Natural Resources Defense Council*, 467 U.S. 837, 843 (1984) (Where the "statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.")

[46] *New York I*, 413 F.3d at 23, 24.

[47] *Id.* at 23.

[48] *Alabama Power* v. *Costle*, 636 F.2d 323, 401 (D.C. Cir. 1979) ("Congress wished to apply the permit process, then, only where industrial changes might increase pollution in an area, not where an existing plant changed its operations in ways that produced no pollution increase."); *Id.* at 360 ("Categorical exemptions may also be permissible as an exercise of agency power, inherent in most statutory schemes, to overlook circumstances that in context may fairly be considered *de minimis*. It is commonplace, of course, that the law does not concern itself with trifling matters, and this principle has often found application in the administrative context.").

[49] Emissions decreases may also be accounted for in Step 2; however, the text in the NSR regulations reads that such decreases are ones "other" than those associated with the project being evaluated in Step 1. 40 CFR 52.21(b)(3)(i)(b). Emissions decreases may also be accounted for in Step 2. However, if the source has had other creditable emissions increases that are contemporaneous with the project and must be accounted for at Step 2, the effect of these creditable emissions increases may be larger than the emissions decreases from the project. In this way, without project emissions accounting, a project that by itself results in a *de minimis* increase or even an overall emissions decrease could be subject to major NSR when emissions increases from other projects are considered in Step 2.

[50] For example, National Mining Association Response to Request for Comments on Regulations Appropriate for Repeal, Replacement, or Modification Pursuant to Executive Order 13777, 82 FR 17793, April 13, 2017. at 3–4. EPA–HQ–2017–0190–37770; Testimony of Paul Noe for American Forest & Paper Association (AF&PA) and American Wood Council (AWC). House Energy & Commerce Committee, Subcommittee on Environment and Climate Change. Oversight Hearing on "New Source Review Permitting Challenges for Manufacturing and Infrastructure." at 2, 5, 7–8. February 14, 2018; AF&PA and AWC April 25, 2019. Executive Order 12866 meeting materials (EPA–HQ–OAR–2018–0048).

entail, and given past EPA statements [51] that emissions decreases could not be accounted for in Step 1. Several commenters on the proposal also provided descriptions of actual projects that produced both increases and decreases in emissions to illustrate the types of projects that may result in overall emissions decreases in Step 1 of the NSR major modification applicability test.[52]

## III. Final Action

### A. Summary of Final Action

In this action, we are finalizing the proposed clarifications to the Step 1 provisions of the major modification applicability test at 40 CFR 52.21(a)(2)(iv).[53] More specifically, we are finalizing minor revisions to the regulations that apply to projects that involve multiple types of emissions units [54] to state that both emissions increases and decreases can be considered in Step 1 of the NSR major modification applicability test in the same manner as they are considered for projects that only involve existing emissions units [55] or only involve new emissions units.[56] These minor revisions include, but are not limited to, changing the term "sum of the emissions increase" to "sum of the difference" in the context of the hybrid test that applies to multiple types of emissions units and adding a provision that specifies that the term "sum of the difference" as used for all types of units (new, existing and the combination of new and existing units) shall include both increases and decreases in emissions as calculated in accordance with those subparagraphs.

The EPA is also concluding that it is appropriate to apply its "project aggregation" interpretation and policy, set forth in the 2018 final action that completed reconsideration of a 2009 action on this topic ("the 2018 final action on project aggregation"),[57] to Step 1 of the NSR major modification applicability test for projects that involve both increases and decreases in

emissions. Application of this policy may assist sources that are responsible for determining the scope of a project to make that determination and avoid the over aggregation or under aggregation of activities that could subsequently be considered an effort to circumvent the NSR program. As discussed in the 2018 final action on project aggregation, the "substantially related" test in the project aggregation interpretation and policy calls for sources to aggregate emissions from nominally separate activities when there is an apparent technical or economical interconnection between those activities. This 2018 final action on project aggregation also includes a rebuttable presumption that activities that occur outside a 3-year period are not related and should not be grouped into one project.

Furthermore, the EPA is concluding that the provisions at 40 CFR 52.21(r)(6) are adequate to ensure sufficient monitoring, recordkeeping and reporting of emissions for projects determined not to trigger major NSR, after considering both emissions increases and decreases from the project in Step 1 of the NSR major modification applicability test. These requirements apply when there is a "reasonable possibility" that the project could still result in a significant emissions increase. Lastly, the EPA is not making the regulatory changes in this final rule mandatory for adoption by state and local air agencies with approved major NSR programs. Thus, state and local air agencies can adopt these changes at their discretion.

### B. Comments Received and Basis for Final Action

#### 1. General Comments on the Proposal

The EPA received approximately 36 detailed comments [58] on the project emissions accounting proposal, which included comments from industry and industry associations, state and local air agencies, other governmental agencies, environmental advocacy groups, and a policy advocacy group. The EPA also received several comments from individuals and more than 600 comments on the proposed rule from a mass mailer campaign.

The EPA's responses to these comments are provided in a separate Response to Comments (RTC) document included in the docket for this final action. This final rule preamble

addresses the most significant comments received.

#### 2. Revisions to Step 1 of the NSR Major Modification Applicability Test

As we explained in Section II.C. of this final rule preamble, the EPA proposed to revise a portion of the major NSR major modification applicability regulations to provide needed clarity over whether project emissions accounting is allowed for all project categories, including projects that involve multiple types of emissions units. Specifically, the EPA proposed to revise the text "sum of the emissions increase" in 40 CFR 52.21(a)(2)(iv)(f) to "sum of the difference," as reflected in subparagraphs 40 CFR 52.21(a)(2)(iv)(c)–(d), the applicability test that applies to only existing units or only new units respectively, to clarify that both emissions increases and decreases in emissions resulting from a proposed project can be considered in Step 1 of the NSR major modification applicability test.

We also proposed to clarify that the revised term "sum of the difference" would apply to "all emissions units" instead of "for each emissions unit" to make clear that for projects that involve multiple types of emissions units, the source owner or operator will first calculate the "sum of the difference" for each existing unit and "sum of the difference" for each new unit according to 40 CFR 52.21(a)(2)(iv)(c) and (d) respectively, and then, the owner or operator would proceed to add the "sum of the difference" from (c) and (d) according to 40 CFR 52.21(a)(2)(iv)(f), the hybrid test.

In addition, the EPA proposed to add to the regulation a provision that specifies that the term "sum of the difference," as used in the referenced subparagraphs, shall include both increases and decreases in emissions as calculated in accordance with those subparagraphs. With these proposed revisions, we believe the regulations make clear that accounting for emissions decreases in Step 1 of the major modification applicability test is allowed for all projects, including projects that involve multiple types of emissions units.

Several commenters supported the proposal's premise of revising the regulatory text to provide clarity that both emissions increases and decreases can be considered in Step 1 of the NSR major modification applicability test for projects that involve multiple types of emissions units. A few of these commenters also supported the specific regulatory text revisions proposed. The commenters stated that the proposal, if

---

[51] 84 FR 39244, at 39247–39248 (August 9, 2019). The proposal preamble includes a full description of these past statements.

[52] For example, see comments in the regulatory docket for this action at EPA–HQ–OAR–2018–0048–0056, EPA–HQ–OAR–2018–0048–0072 and EPA–HQ–OAR–2018–0048–0077.

[53] Supra n.03.

[54] 40 CFR 52.21(a)(2)(iv)(f).

[55] 40 CFR 52.21(a)(2)(iv)(c).

[56] 40 CFR 52.21(a)(2)(iv)(d).

[57] 83 FR 57324 (November 15, 2018). The EPA notes, however, that state and local air agencies with approved SIPs are and were not required to amend their plans to adopt the interpretation that projects should be aggregated when "substantially related."

[58] A few of the comments received include comments from separate entities that joined efforts to provide comments on the proposal for this final action and thus more than 36 associations, government agencies, groups or industry representatives commented on the proposal.

finalized, would improve and streamline the permitting process, provide for the timely issuance of permits, and spark economic growth, while still protecting the environment because sources would be more likely to undertake projects that would reduce emissions if those projects were not subject to the NSR major modification requirements.

The EPA agrees with the commenters who believe that the revisions being finalized in this rule will add clarity to Step 1 of the NSR major modification applicability test and provide a more accurate accounting of a project's actual emissions impact. This clarity and accuracy could potentially incentivize energy efficiency and/or other environmentally beneficial projects, thereby furthering the Congressional purpose of the NSR program which is to ensure environmental protection while allowing for economic growth.[59] We also agree with the commenters who supported the specific regulatory text revisions we proposed that were mentioned previously.

On the other hand, several commenters argued that, by allowing sources to take credit for emissions decreases from a project in Step 1, facilities may be able to avoid major NSR permitting requirements including the installation of controls based upon BACT or LAER determinations, leading to an increase in emissions. The commenters stated that the proposed rule, if adopted, would potentially reverse air quality gains that have been accomplished over the last few decades, thereby increasing the likelihood of adverse impacts to human health and the environment. These commenters urged the EPA to withdraw the proposed rule and one commenter also urged the EPA to withdraw the March 13, 2018 Memorandum on the same subject.

These comments were echoed by the mass mailer campaign commenters who added that the proposed rule would have the effect of allowing sources to increase emissions without control requirements, thereby enabling coal-fired power plants to operate longer and emit more pollution, reversing the progress that has been achieved in reducing acid rain in the Adirondacks.

The EPA respectfully disagrees with these commenters, including the mass mailer campaign commenters. First, this rule does not directly pertain to or impact acid rain production in the Adirondacks. Second, we do not have a reason to believe that the clarifications to the NSR regulations reflected in this rule will lead to significant and overall emissions increases as a result of construction at stationary sources. Projects that cause emissions increases are already not subject to major NSR requirements if the increases in emissions are below the SERs, with or without considering the associated emissions decreases in Step 1 of the NSR major modification applicability test. Nothing in this rule alters those requirements. For many projects, when considering both emission increases and decreases in Step 1, the project will likely not result in a significant emissions increase and should be treated as *de minimis*. This rule is only a clarification of our existing regulations regarding how to conduct projections of project emissions changes by including emissions increases and decreases in this projection as part of Step 1 of the NSR major modification applicability test for projects that involve multiple types of emissions units to make those requirements consistent with the applicability test for projects that only involve new units or only involve existing units. Those clarifications are based on a logical reading of the statute and consistent with the congressional intent for the NSR program, which is to ensure environmental protection while allowing for economic growth. Finally, even though certain projects may not be subject to the NSR major modification requirements, they may still be subject to the applicable minor NSR program permitting requirements.

These commenters did not provide information that demonstrates that it would always be more environmentally beneficial for each project potentially affected by this rule to proceed through the major NSR permitting process and thereby become subject to the applicable NSR permitting requirements, including the installation of BACT or LAER air pollution control technology. There may be environmental benefits from allowing a source to consider decreases in Step 1 and, therefore, not trigger major NSR based on a more accurate accounting of the emissions from the project. By clarifying that decreases may be considered in Step 1, the rule provides an incentive for sources to design their projects to include emissions decreases and pollution controls.[60] In addition,

projects that avoid major NSR because they include emission decreases in their calculation of the proposed project's emissions in Step 1 would not necessarily otherwise trigger major NSR because they may not result in a significant net emissions increase in Step 2. Furthermore, the EPA has been told by stakeholders that some projects may not even move forward if the applicant cannot include emissions decreases in its calculation of the proposed' project emissions in Step 1.

However, quantifying the environmental impacts of this rule, as with any NSR rule, is difficult because NSR permitting actions are case-by-case determinations that vary based on the characteristics of the source of emissions (*e.g.,* location, magnitude of emissions and stack heights), the attainment status of the area, and many other characteristics, including business decisions on whether to proceed with a particular project at a certain point in time. The EPA does not have sufficient permitting data to make this quantification and even if the EPA were to request that information through an Information Collection Request for the entire United States or a subset of states, the permit application data do not include information on many important considerations including, for example, the records of any business decisions on whether to proceed with a particular project. We also do not have access to, nor do we require, reporting of any information regarding decisions made for projects that were not pursued.

Thus, to address this information gap, the EPA requested in its August 2019 proposal any examples of the emissions and cost impacts of considering both emissions increases and decreases in Step 1 of the NSR major modification applicability test. Several commenters answered that information request by providing descriptions of projects that produced both increases and decreases in emissions to illustrate the types of projects that may result in overall emissions decreases in Step 1 of the NSR major modification applicability test.[61] Two other commenters provided examples highlighting how finalizing this action would achieve emissions reductions while also reducing the NSR regulatory burden in the electric utility sector.[62] Others provided various comments that suggest that this rule

---

[59] *Wisconsin Elec. Power Co.* v. *Reilly,* 893 F.2d 901, 909–10 (7th Cir. 1990). ("[The] PSD program "represented a balance between 'the economic interests in permitting capital improvements to continue and the environmental interest in improving air quality.' (quoting *Chevron,* 467 U.S. at 851)).

[60] By allowing decreases in Step 1, we are incentivizing sources to design their projects to include emissions decreases and controls that may</br>

be as stringent or more stringent than the BACT or LAER requirements.

[61] These comments can be found in Section 4.0 of the Response to Comments document for this action.

[62] These comments can be found in Section 5.0 of the Response to Comments document for this action.

may promote emissions reductions by encouraging industry to seek emissions reduction opportunities in their planning processes that they might otherwise forego if they were subject to the major NSR program. However, the information provided did not fill all the data gaps (as explained previously, these include emissions characteristics, cost impacts, business decisions on whether to proceed with a particular project, etc.), and it also did not show that consideration of emissions decreases in Step 1 would necessarily result in more emissions than would be allowed if major NSR requirements are triggered based on emissions increases alone.

In the face of this uncertainty over whether the clarification reflected in this rule will increase emissions from construction at stationary source of air pollution, we have placed greater importance on ensuring that the NSR regulations are clear, logical, and consistent with Congressional intent. As explained in greater detail in Section III.B.3. of this final rule's preamble and in the Response to Comments document for this action, the EPA views allowing for project emissions accounting to be more consistent with the requirement in the Act that a physical change or change in the method of operation at an existing major stationary source is subject to major NSR if it results in a significant increase in emissions. If project emissions accounting were not allowed, a project that does not result in an overall significant increase in emissions or that actually decreases emissions into the ambient air could be subject to NSR. The EPA believes that allowing for the consideration of the full effect of a project, including any associated decreases, is consistent with the 2002 NSR Reform Rule and more faithfully implements the intent of Congress for the NSR programs, which is to ensure environmental protection while allowing for economic growth. That is because projects that, in total, would result in insignificant emissions increases or overall emissions reductions might be delayed or foregone due to the potential complexities of undergoing a Step 2 major modification applicability process or requiring a major NSR permit.

3. Legal Rationale

As noted in Background Section II.D. of this rule's preamble, the major NSR applicability regulations reflect an interpretation of the statutory phrase "increases the amount of any air pollutant emitted" contained in the

definition of "modification."[63] This definition is cross referenced in both Part C (PSD) and Part D (NNSR) of Title I of the CAA.[64] The D.C. Circuit has recognized that the CAA "is silent on how to calculate such 'increases' in emissions."[65] Thus, the question of how to determine whether a physical change or change in method of operation "increases" emissions is ambiguous.[66] Accordingly, because the statutory text does not itself dictate how to determine whether a physical change or change in the method of operation "increases" emissions, under principles established by the Supreme Court,[67] the "EPA has the authority to choose an interpretation" of the term "increases" in "administering the NSR program and filling in the gaps left by Congress."[68] And in choosing an interpretation of the term "increases" in relation to the administration of the NSR program,", "[t]here can be no doubt that [the] EPA is entitled to balance environmental concerns with economic and administrative concerns, at least to a point."[69]

After reviewing comments received on the proposal, the EPA continues to believe that when determining whether a physical change or change in the method of operation "increases" emissions, allowing for project emissions accounting at Step 1 of the NSR major modification applicability test is more consistent with the Clean Air Act, the 2002 NSR Reform Rule, and the statutory purpose of the NSR program. Not allowing for project emissions accounting could lead to a project that actually results in a decrease in emissions being subject to the major NSR permitting requirements. The EPA believes this would undermine the congressional intent of the NSR program of ensuring environmental protection while allowing for economic growth because projects that, in total, would result in insignificant emissions increases or overall emissions reductions might be delayed or foregone due to the potential complexities of undergoing a Step 2 contemporaneous netting process or the time and expense of major NSR permitting. The EPA explains this conclusion in more detail in the Response to Comments document for this final action.

Several commenters objected to the proposal, however, claiming that project

emissions accounting would create an exemption from NSR such that not every physical change or change in method of operation would be considered in the NSR major modification applicability determination. These commenters cited to a D.C. Circuit decision[70] to argue that "any" in the statutory phrase "increases the amount of any air pollutant emitted" contained in the definition of "modification means "any" and the EPA was creating a "project exemption," similar to the equipment replacement rule deemed unlawful in that D.C. Circuit decision, by allowing the source to include unrelated decreases in Step 1 to ensure a project did not result in a significant emissions increase.[71]

The EPA does not agree that the proposal was intended to create a "project exemption" because, unlike the equipment replacement rule found to be unlawful in that decision, this rule merely clarifies pre-existing applicability requirements and does not provide an exemption from major NSR. This rule simply conforms the regulatory text for projects that involve multiple types of emissions units with the regulatory text that applies to projects that only involve new units or that only involve existing units, and also expressly articulates a meaning of the term "sum of the difference" that is inherent in the phrase. The EPA has already applied a similar approach following the March 2018 Memorandum, and this final rule merely clarifies the regulations.

The EPA also disagrees with commenters that argue that this rule precludes consideration of "any" physical change or change in method of operation under the NSR major modification applicability test. Although we proposed that taking account of emissions decreases at Step 1 did not present any reasonable concerns regarding NSR circumvention[72] under the EPA's

[63] Supra n.41.
[64] Supra n.42.
[65] Supra n.43.
[66] Supra n.44.
[67] Supra n.45.
[68] Supra n.46.
[69] Supra n.47.

[70] New York v. EPA, 443 F.3d 880 (D.C. Cir. 2006) (New York II).

[71] New York II, 443 F.3d at 887–8 (by using the word expansive word "any" in describing the emissions-increasing changes that qualify as a "modification" under Clean Air Act section 111(a)(4), Congress precluded the EPA from excluding some such changes from NSR).

[72] 84 FR 39244, at 39251 (August 9, 2019). ("We do not believe it is necessary to adopt the same criteria that apply for separation of activities (i.e., under aggregation) to the grouping of activities, by considering such grouping to potentially constitute "over aggregation" that, in turn. may constitute NSR circumvention. The circumvention policy speaks to the situation where a source carves up what is plainly a single project into multiple projects, where each of those separate projects may
Continued

project aggregation policy,[73] the EPA recognizes that certain aspects of the proposal could have led to the conclusion that the proposed rule change would allow sources to attempt to avoid NSR by allowing sources to include unrelated emissions decreases as part of the project under consideration. Thus, in response to the concerns raised by these and other commenters, the EPA has determined it is appropriate to limit the scope of emissions decreases that can be considered at Step 1 to only the project under review and to not allow sources to attempt to avoid NSR by expanding the scope of decreases to those that are not truly part of the project. As discussed in more detail in Section III.B.4 of this preamble, the EPA has concluded that it is appropriate to apply its project aggregation policy to both emissions increases and decreases to determine the scope of the project in Step 1 of the NSR applicability analysis. Many of the commenters' concerns regarding the review of "any" physical change or change in method of operation can be addressed by rationally defining the scope of a project, consistent with this policy. The application of the "substantially-related" test of the 2018 final action on project aggregation should be sufficient to prevent sources from arbitrarily grouping activities for the sole purpose of avoiding the NSR major modification requirements through project emissions accounting. That is because when applying the "substantially related" test

to determine the scope of a project, sources should only aggregate emissions changes when there is an apparent technical or economical interconnection between the physical and operational changes. In addition, sources should include in a common project in Step 1 all activities (and only those activities) that meet this "substantially related" test.

Commenters also argued that the EPA had unlawfully not required that emissions decreases be contemporaneous or enforceable in Step 1 of the NSR major modification applicability test. However, the EPA believes that any emission decreases considered in Step 1 are and will need to be contemporaneous because, the "substantially related" test has a temporal component and, as discussed more in Section III.B.4 of this preamble and in the Response to Comments document for this final action, the decreases must be part of the same project.

Regarding the comments that emissions decreases are required to be enforceable,[74] the commenters correctly pointed to the requirement regarding the enforceability of Step 2 contemporaneous emissions decreases and the EPA is not changing those requirements as part of the rule. However, Step 2 contemporaneous netting is a distinct idea from project emissions accounting and parallel requirements are not necessarily warranted when the context is considered. Where a source is using emissions reductions from another project within a 5-year contemporaneous period to "net out" of major NSR permitting, it is important that decreases in emissions from another project that are used for this purpose be enforceable to ensure that the reduction is real and permanent. This is because a project that would result in a significant emissions increase is avoiding major NSR due to unrelated changes made at the facility. Project emissions accounting does not allow emissions reductions from another project to be used to avoid major NSR in this way. Rather, project emissions accounting is part of the process for projecting the actual emissions change at a facility resulting from a single project. In this distinct context, the EPA decided in 2002 against requiring that such a projection be enforceable. Instead, the EPA established simply recordkeeping and reporting

requirements to help enforcement authorities hold sources accountable for their projections when there is a reasonable possibility the project could trigger major NSR. In addition, the NSR regulations provide that "[r]egardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase."[75] Therefore, while the EPA is not requiring *projections* to be enforceable at Step 1 regardless of whether the source owner or operator projected increases or decreases in emissions, the NSR regulations do provide for an overall enforceable limitation on actual emission increases. If any emissions decreases are overstated, or any increases understated, the source may be subject to liability if its actual emissions due to the project exceed *de minimis* thresholds. Moreover, the EPA anticipates that even if, in accounting for the full impact of a project at Step 1, a source would not be required to obtain a major NSR permit, the vast majority of these projects would still be required to obtain a minor NSR permit under the state minor NSR permit program and the EPA anticipates that the emissions decrease(s) from the project would be documented in the permit record.

The EPA does not believe the policy rationale that the commenters provided for wanting the EPA to require that decreases in Step 1 be enforceable outweighs the EPA's policy rationale for not requiring projected actual emissions increases from a project to be enforceable and for treating emission decreases and increases in the same manner when calculating the proposed project emissions in Step 1.[76] As such, the EPA is not finalizing, as part of this action, a requirement that emissions increases or decreases be enforceable in Step 1 unless required by the applicable regulations.[77] As the EPA explained in the proposal, the EPA intends to treat projected actual emissions used in calculating emissions decreases from a project in the same manner as it does emissions increases since they are both part of the same project. Emission decreases should be considered simply part of the projected emissions for the

---

result in emissions increases below the significance threshold but which, if considered collectively as one project, would result in an emissions increase above the threshold. Separate activities that, when considered together, either decrease emissions or result in an increase that is not significant are not in view in the EPA's circumvention policy.")

[73] 84 FR 39244, at 39250 (August 9, 2019). As explained in more detail in the proposal preamble for this action, the 2018 final action on project aggregation describes the procedure (*i.e.*, the "substantially related" test or "circumvention policy") "for determining the circumstances under which nominally separate activities should reasonably be considered to be a single project." More specifically, the policy calls "for sources and reviewing authorities to aggregate emissions from nominally-separate activities when they are 'substantially related.'" For a project to be substantially related, the "interrelationship and interdependence of the activities [is expected], such that substantially related activities are likely to be jointly planned (*i.e.*, part of the same capital improvement project or engineering study), and occur close in time and at components that are functionally interconnected." In addition, the final "project aggregation" action adds that in general "[to] be 'substantially related,' there should be an apparent interconnection—either technically or economically—between the physical and/or operational changes, whereby a change at a plant may exist and operate independently, however its benefit is significantly reduced without the other activity."

[74] In this context, the term enforceable is intended to mean that the projections of a decrease in actual emissions for an existing emissions unit need to be enforceable as a practical matter (*e.g.*, accompanied by an emission limit).

[75] 40 CFR 52.21(a)(2)(iv)(*b*).

[76] 84 FR 39244, at 39251 (August 9, 2019). ("[T]he EPA currently believes that 'the same reasoning that underpinned the 2002 NSR Reform Rule's treatment of projected actual increases applies equally to projected emissions decreases at Step 1.'").

[77] For new emissions units (including any units that have been in operation for less than two years), any emissions increases and decreases would be enforceable because the applicability test for new units is the actual-to-potential test. 40 CFR 52.21(a)(2)(iv)(*d*); *id.* 52.21(b)(4); *id.* 52.21(b)(7).

project, not some discrete change from the project subject to different or additional requirements. A lower projected emission increase at an existing emissions unit involved in a project can have the same numerical effect on the result of the Step 1 applicability calculation by itself as a projected increase combined with a projected emissions decrease at another unit that is involved in the project. Therefore, we see no reason why enforceability of projected actual emissions should be required in one instance and not the other. Thus, the reasoning the EPA applied when declining to require that projected actual emissions be made enforceable as part of the 2002 NSR Reform rule continues to apply to projected actual emissions that are derived by combining increases and decreases from the same project in accordance with the clarification reflected in this rule.[78] As we explain in more detail in Section III.B 4 of this preamble, requiring that projected actual emissions decreases be enforceable in Step 1 could effectively replace the actual-to-projected-actual[79] applicability test for existing units with an actual-to-potential test,[80] or, more accurately, an actual-to-allowable test,[81] which would directly conflict with the EPA's reasoning for adopting the actual-to-projected-actual applicability test in 2002. Among other reasons, limiting projected actual emissions to allowable emissions (even if only for emissions decreases) could confiscate unused capacity of the source[82] and in some

cases result in the source later retroactively becoming subject to major NSR requirements.[83] The EPA believes such an outcome would be unacceptable.

Another commenter added that the inclusion of emissions decreases in Step 1 in the NSR major modification applicability calculation must be enforceable, otherwise it would render Step 2 of the analysis meaningless. The commenter asserted that this rule would produce an absurd result by eviscerating Step 2's prohibition against crediting unenforceable emissions decreases for the purposes of netting out of NSR requirements.

The EPA disagrees that allowing for the consideration of emission decreases as part of the projected actual emissions from the project in Step 1 would render the contemporaneous netting provisions of the regulations superfluous or lead to absurd results. Allowing emissions decreases from the project under review to be considered in Step 1 does not mean that Step 2 is superfluous. Step 1 is limited to emissions increases and decreases from the *same* project. The source could still only account for emissions decreases from *another* project within the contemporaneous period in Step 2, subject to the other limitations of contemporaneous netting. In addition, the "substantially related" test mentioned previously, and further explained in Section III.B.4. of this preamble, applies to prevent aggregating into a single project those activities that do not represent such project, so decreases from activities that do not meet this test should not be considered in Step 1. Therefore, Step 2 is not superfluous because it clearly still serves a purpose of considering emissions increases and decreases from other projects that are contemporaneous with the proposed project and otherwise creditable. As discussed previously, if decreases from the project could not be considered in Step 1, that could potentially subject a project that decreases emissions overall to the major NSR permitting requirements. In addition, as noted previously, while the EPA is not requiring projections of decreases at Step 1 to be enforceable, the major NSR regulations contain a provision that "[r]egardless of any such

preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase."[84] Therefore, there is an inherent enforceable limitation on increases of actual emissions.

Finally, an additional commenter asserted that the agency's proposal foregoes statutorily specified benefits— avoidance of air quality violations, improved pollution-control technologies, offsetting emission reductions—in a fashion that is incompatible with any lawful exercise of *de minimis* discretion. This contention is countered by other commenters, however, who stated that this final rule is not an exemption from NSR applicability and is instead a clarification of pre-existing regulatory text specifying how NSR applicability is to be determined for projects that involve multiple types of emissions units.

We agree with the latter commenters. The clarification reflected in this rule is not based on inherent *de minimis* exemption authority and does not alter the EPA's determination of the level of emissions that is significant for any pollutant. As stated previously, each physical change or change in method of operation must still be compared to the significance levels to determine whether or not the change results in an emissions increase that is *de minimis*. All this rule does is clarify that, in projecting whether a project will result in a non-*de minimis* increase in actual emissions, the source can quantify such an increase based on the full scope of the project, including any portions of the project that are projected to decrease actual emissions. The EPA believes that allowing a source to conduct projections of actual emissions in Step 1 for the full scope of the project, including any decreases in emissions caused by the project, is the best reading of CAA section 111(a)(4) because it will ensure that projects that overall decrease emissions or result in a *de minimis* increase in emissions will not be subject to the major NSR program.

4. Defining the Scope of a Project

In the proposal, we said that defining the scope of the project was within the discretion of the source. We also indicated that when a source is defining the scope of the project: (1) Separating activities into smaller projects (*i.e.,* under aggregation) to circumvent the NSR major modifications permitting requirements could be prevented by applying the interpretation and policy

---

[78] 67 FR 80185, at 80204 (December 31, 2002). In the 2002 NSR Reform rule, the EPA expressly declined to adopt a requirement under which a source's projected actual emissions would have become an enforceable emission limitation because: (1) "we are concerned that such a requirement may place an unmanageable resource burden on reviewing authorities," and (2) "we also believe that it is not necessary to make . . . future projections enforceable in order to adequately enforce the major NSR requirements. The Act provides ample authority to enforce the major NSR requirements if . . . [a] physical or operational change results in . . . [a] significant net emissions increase at . . . [a] major stationary source."

[79] The actual-to-projected-actual applicability test for projects that only involve existing emissions units is the test defined in 40 CFR 52.21(a)(2)(iv)(*c*).

[80] The actual-to-potential test for projects that only involve new emission units is the test defined in 40 CFR 52.21(a)(2)(iv)(*d*).

[81] This is because under the approach requiring enforceability of emissions decreases, the projected actual emissions for an emissions unit would become the allowable emissions for that unit. The definition of allowable emissions can be found at 40 CFR 52.21(b)(16).

[82] For example, if a source was required to establish an enforceable emission limit to consider a decrease that is the result of the project, the source may not be able to later increase production or hours of operation, which would otherwise not even be considered a physical change or change in

method of operation subject to NSR applicability. 40 CFR 52.21(b)(2)(iii)(*l*).

[83] This is the opposite of the confiscation of unused capacity: if such an allowable emissions limitation was required and is subsequently relaxed to accommodate an unrelated increase in production rate or hours of operation, and that relaxation resulted in the modification becoming major, the source could become subject to major NSR requirements as if construction had not yet commenced. 40 CFR 52.21(r)(4).

[84] 40 CFR 52.21(a)(2)(iv)(*b*).

set forth in the 2018 final action on project aggregation and (2) adding multiple activities into bigger projects (*i.e.*, over aggregation) was not precluded by any prior interpretation or policy.[85] On this latter point, we added that separate activities which, when considered together, either decrease emissions or result in an increase that is not significant were not previously considered as part of the EPA's circumvention policy. However, we requested comment on whether we should instead apply the "substantially related" criteria to prevent over-aggregation in Step 1 and asked what the impact of applying such a standard would be.[86]

Multiple commenters expressed support for the proposed concept that the scope of a project be at the discretion of the source and that the absence of a provision defining the scope of a project does not create an incentive to over-aggregate.[87] Commenters supported this proposed concept on the grounds that this discretion would allow sources to undertake activities that would reduce overall emissions in cases where a project is comprised of multiple emissions units.

Several commenters, however, expressed concerns that the scope of a project to which project emissions accounting is applied should be defined.[88] Otherwise, any ambiguity in defining the scope of the project would constrain a reviewing authority's ability to verify whether the source has reasonably exercised its discretion in applying project emissions accounting to a project. Other commenters added that the lack of criteria for determining the scope of a project would allow sources to circumvent NSR requirements by selectively considering emissions decreases with unrelated and non-contemporaneous increases. To this point, commenters expressed concern that, under the proposed rule, sources would be able to circumvent NSR requirements by finding

contemporaneous emission reductions within the facility and considering them to be part of the project, while not incorporating similar contemporaneous emission increases in the scope of the project.

The EPA does not concur with the commenters who stated that circumvention of the NSR permitting requirements is a likely outcome of the proposed rule because, while not previously contemplated by our project aggregation policy, the EPA has concluded after review of the comments received on the proposal for this action that the "substantially related" test from our 2018 final action on project aggregation interpretation and policy provides the appropriate basis for sources to determine the scope of a project in Step 1 of the NSR applicability analysis. We believe that applying the 2018 final action on project aggregation interpretation and policy in this context alleviates concerns about potential NSR circumvention in Step 1 of the NSR major modification applicability test. The "substantially related" test, which is reflected in the 2018 final action on project aggregation, calls for sources to aggregate emissions from nominally separate activities when there is an apparent technical or economical interconnection between the physical and operational changes. This 2018 final action on project aggregation also includes a policy of applying a rebuttable presumption that project activities that occur outside a 3-year period are not related and should not be grouped into one project. The EPA has observed that "[w]hen activities are undertaken three or more years apart, there is less of a basis that they have a substantial technical or economic relationship because the activities are typically part of entirely different planning and capital funding cycles."[89]

Under this 2018 final action on project aggregation interpretation and policy, sources continue to have discretion in defining the scope of the project based on their business needs, but at the same time should not arbitrarily group project activities for the purpose of avoiding the NSR major modification requirements. Rather, in accordance with the 2018 final action on project aggregation, sources should define a project to include all activities, and only those activities, that meet the "substantially related" test.

Other commenters asserted that the EPA failed to address the possibility that facilities could circumvent NSR by proffering in Step 1 an emissions decrease that turns out to be nothing but

a temporary reduction, thus avoiding the need to even modify equipment or install a pollution control device. A commenter added that some courts have imposed a statute of limitations that runs 5 years from the date of the modification and that the proposal, in conjunction with those rulings, invited a source to claim unenforceable decreases to avoid NSR, then simply avoid following through once the limitations period has passed.

We disagree with these commenters. The decrease in emissions in Step 1 will be calculated in most cases using the actual-to-projected-actual applicability test, and the projected actual emissions calculation in that test must be based on consideration of all relevant information.[90] If there is a "reasonable possibility" that the project may result in a significant emissions increase, as defined in the regulations at 40 CFR 52.21(r)(6), the source must meet applicable pre- and post-project recordkeeping, monitoring, and reporting requirements that apply for 5 or 10 years following the resumption of regular operation after the project, depending on the nature of the project. As such, the "reasonable possibility" provisions would provide the records necessary for reviewing authorities to ensure that the emissions reductions are not temporary and provide for enforcement of the major NSR program requirements, as necessary. The EPA also believes that the regulatory text at 40 CFR 52.21(a)(2)(iv)(*b*) that states, "[r]egardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase" provides a safeguard that will ensure that the emissions reductions are not temporary or illusory. If a source, upon resuming regular operation after a project, fails to realize a reduction in emissions that was projected from a particular unit, or if that reduction is less than was projected, such that the overall emissions increase from the project exceeds the applicable significant emissions rates, then the source could be subject to NSR at that time and potentially an enforcement action. While a commenter expressed concern that some sources may claim unenforceable decreases to avoid NSR and then simply avoid following through with those decreases once the statute of limitations period has passed, the EPA views this possibility as remote because of the safeguard at 40 CFR

---

[85] As stated previously, the term "project" is defined in our regulations at 40 CFR 52.21(b)(52). In general, we use the term "project" to mean the physical change or change in method of operation under review, though this can encompass one or more activities at an existing major source. On the other hand, the term "project aggregation" used in the agency's 2018 project aggregation interpretation and policy discusses how multiple activities should be evaluated to determine whether these activities constitute one project.

[86] 84 FR 39244 at 39251 (August 9, 2019).

[87] These comments can be found in Section 5.0 of the Response to Comments document for this action.

[88] These comments can be found in Section 5.0 of the Response to Comments document for this action.

[89] 74 FR 2376. at 2380 (January 15, 2009).

[90] 40 CFR 52.21(b)(41)(ii)(*a*).

52.21(a)(2)(iv)(*b*) and the potential for civil, or even criminal, enforcement.[91]

Finally, several commenters questioned the EPA's decision to forgo a requirement that emissions reductions be enforceable and creditable in order to be used in project emissions accounting. These commenters stated that allowing sources to include uncreditable and unenforceable projected project emission decreases with the knowledge that the EPA will not second-guess those projections, referring to the Actual-to-Projected-Actual Applicability Test Memorandum issued by the EPA in December 2017,[92] readily invited NSR circumvention and increased air pollution with no ability for third-party enforcement.

The EPA disagrees with these commenters. First, as explained in the August 2019 proposal and in the legal rationale section of this final action (Section III.B.3), the EPA intends to treat the calculation of emissions decreases from a proposed project in the same manner as it does emissions increases from the same proposed project (*i.e.,* including emissions increases and decreases in Step 1 because both are necessary to determine the emissions resulting from the project). Second, requiring that projected actual emissions be made enforceable at the time of the project could effectively replace the actual-to-projected-actual applicability test with an actual-to-potential test, or, more accurately, an actual-to-allowable test, which would directly conflict with the EPA's reasoning for adopting the actual-to-projected-actual applicability test in 2002 and with what the EPA believes is the best reading of CAA section 111(a)(4). Third, the EPA believes that a requirement that projected actual emissions be made enforceable at the time of the project would effectively confiscate any unused capacity at the effected emissions unit and potentially require that any future project(s) that

might increase emissions from that unit trigger major NSR retroactively.[93] In responding to comments on the actual-to-potential methodology in 2002, the EPA noted that the establishment of an enforceable permit limit "may restrict the ability of a source to increase its emissions in association with an increase in production or hours of operation, which when done alone are not normally considered as physical or operational changes."[94] The EPA also stated "[w]e generally agree with commenters who have argued that existing emissions units in general (including replacement and reconstructed units) have ample track record such that the projection of the proposed project emissions alone is sufficiently reliable and enforceable and thus the burdens of up-front permit caps on emissions are unnecessary" and "[w]e disagree with the commenters who thought that the 'actual-to-potential' test should be retained because, among other things, the recordkeeping requirements associated with the 'actual-to-projected-actual' test would be burdensome . . . for most sources, the burden of recordkeeping [associated with use of the actual-to-projected-actual applicability test] is substantially less than the present burden of obtaining a permit containing an up-front cap on actual emissions."[95] Thus, consistent with our reasoning in 2002, the EPA does not believe that these outcomes and making emissions reductions enforceable in Step 1 are necessary in order for sources evaluating projects that involve existing emissions units to reasonably determine whether such projects would result in a significant increase in *actual* emissions just because the project includes a calculated decrease in emissions at one or more emissions units.

In any event, the regulations provide that "[r]egardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase."[96] Therefore, the EPA believes the NSR regulations do provide a mechanism for enforcement if a project is erroneously projected not to result in a significant emissions increase. In addition, many, if not most, of emissions decreases that result from a project will be due to the installation of controls or the removal of an emissions unit. The EPA still believes, as it did in 2002, that even if,

in accounting for the full impact of a project in Step 1, a source would not be required to obtain a major NSR permit, the large majority of these projects would still be required, as noted earlier, to obtain a minor NSR permit under the state or local air agency minor NSR permitting program and, therefore, the project activities and any emissions decrease(s) accounted for would be documented in those permit records.[97] The EPA-approved implementation plans will also still need to include enforceable emission limits and other control measures intended to protect air quality and a program for "regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D of this subchapter."[98] Nothing in this final rule conflicts with or diminishes these SIP requirements.

Finally, the December 2017 ATPA Memorandum is not within the scope of this rulemaking, nor does it have any bearing on this final rule. The December 2017 ATPA Memorandum communicated how the EPA intends to apply and exercise its enforcement discretion related to certain aspects of the applicability provisions of the NSR regulations. The policy contained in that Memorandum does not constitute a rule, regulation, or other legally binding requirement and it does not change or substitute for any law, rule or regulation, or other legally binding requirement. We, therefore, do not agree that this final rule or the December 2017 APTA Memorandum will place any limitations on third-party enforcement of the major NSR program. Nothing in this final rule changes the enforcement provisions available under the CAA to enforce the major NSR permitting requirements nor the ability of third parties to bring potential enforcement actions to the EPA's attention if they suspect that a source has avoided the major NSR permitting requirements.

### 5. Monitoring, Recordkeeping and Reporting of Emissions Decreases in Step 1 of the NSR Major Modification Applicability Test

The provisions of 40 CFR 52.21(r)(6) apply to projects involving existing emissions units at a major stationary source in circumstances where the

---

[91] If an activity that was included in an initial projection of actual emissions no longer falls within the scope of the project, the source should reevaluate the projected emissions change of the project without that activity. Therefore, contrary to the commenters concerns, if a source initially includes an activity that decreases emissions in its projection but subsequently decides that that activity is not within the scope of the project, it must redo the project's projected emissions without that emission decreasing activity.

[92] Letter from E. Scott Pruitt, to Regional Administrators, "New Source Review Preconstruction Permitting Requirements; Enforceability and Use of the Actual-to-Projected-Actual Applicability Test in Determining Major Modification Applicability," December 7, 2017 ("December 2017 ATPA Memorandum"), available at: *https://www.epa.gov/sites/production/files/2017-12/documents/nsr_policy_memo.12.7.17.pdf.*

[93] 40 CFR 52.21(r)(4).

[94] 2002 NSR Reform Rule Technical Support Document at I–4–7.

[95] *Id.* at I–4–7, 8.

[96] 40 CFR 52.21(a)(2)(iv)(*b*).

---

[97] The EPA expects that as part of the minor NSR permitting process, the emissions increases and decreases occurring from the project will be documented either in the permit application, demonstrating the non-applicability of major NSR, or as requirements in the minor NSR permit itself.

[98] 42 U.S.C. 7410(a)(2)(C).

owner or operator elects to use the actual-to-projected-actual applicability test for calculating projected actual emissions and there is a reasonable possibility (as defined in subparagraph (r)(6)(vi)) that a project that is not part of a major modification may result in a significant emissions increase. When the reasonable possibility criteria in subparagraph (r)(6)(vi) are triggered, specific pre- and post-project recordkeeping, monitoring and reporting requirements in paragraph (r)(6) must be met, depending on the circumstances. Those include the requirement that before beginning actual construction on the project, the owner or operator document and maintain a record including a description of the project, identification of the emissions unit(s) whose emissions of a regulated NSR pollutant could be affected by the project, and a description of the applicability test used to determine that the project is not a major modification for any regulated NSR pollutant (including certain specified information).

The requirements of 40 CFR 52.21(r)(6) also include pre-project reporting (for electric utility steam generating units) and post-project monitoring and reporting of emissions of any regulated NSR pollutant that could increase as a result of the project and that is emitted by *any emissions unit identified* in the pre-project record whose emissions could be "affected" by the project. Under these monitoring provisions, sources must calculate and maintain a record of the annual emissions, in tons per year on a calendar year basis, for a period of 5- or 10-years following resumption of regular operations after the change, depending on the type of change at the unit(s). Post-project reporting is required for electric utility steam generating units and is triggered when certain specific criteria that are applicable to all other categories of emissions units are met. In accordance with 40 CFR 52.21(r)(7), the information required to be documented and maintained pursuant to paragraph (r)(6) shall be available for review upon a request for inspection by the reviewing authority or the general public. As described in the proposal preamble, the requirements of 40 CFR 52.21(r)(6) apply equally to units with projected increases and projected decreases in emissions, as long as there is a reasonable possibility that the project could result in a significant emissions increase and those units are part of the project (*i.e.,* their emissions "could be affected" by the project).

Various commenters expressed that considering emissions increases and decreases in Step 1 of the NSR major modification applicability test would not necessitate any additional monitoring, recordkeeping, or reporting requirements to promote NSR compliance because the current requirements under 40 CFR 52.21(r)(6) are adequate for this purpose. A couple of these commenters came to this determination because, in the existing rules, the EPA has already determined that sources should not be required to track small projected increases that are well below the relevant significant emissions rates, and there is even less reason to track projected decreases, since the "possibility" of a significant increase is even more remote. Some of these commenters noted that existing monitoring, recordkeeping, and reporting provisions in state and federal laws that cover all NSR-affected "major sources," and particularly the requirements for ". . . semiannual reporting, compliance reporting and certifications, and periodic emissions inventory reporting under Title V permits, are stringent and adequate to assure that NSR violations will not occur as a result" of considering emissions increases and decreases in Step 1. Another commenter added that minor source permitting requirements will often apply to projects that are not subject to major NSR permitting and that the reviewing authority will verify a source's rationale for determining that a project is minor.

Other commenters, however, felt that the "reasonable possibility" provisions of 40 CFR 52.21(r)(6) are insufficient to guard against potential circumvention of NSR requirements. Commenters in this group stated that sources would be able to forgo the reasonable possibility requirements by projecting that an emissions increase will be less than 50 percent of the significant emission increase level. A few commenters added that reliance on the provisions of 40 CFR 52.21(r)(6) would complicate enforcement actions because the calculations sources conduct to comply with these provisions often do not include all emissions units associated with a project, especially affected units that are not modified or constructed under a project. These commenters emphasized that while sources can explain if annual emissions from a project exceed the baseline emissions by an amount greater than the significant emission rate, assessing the validity of such explanations places an undue burden upon the reviewing authority.

Several commenters suggested that the problems related to the lack of

monitoring, recordkeeping, and reporting requirements for sources whose emissions do not meet the "reasonable possibility" threshold is compounded by the EPA's decision to not require that emissions decreases considered in Step 1 be enforceable. According to these commenters, sources considering emissions increases and decreases in Step 1 of the NSR major modification applicability test would be able to pair an unenforceable emission decrease with an otherwise significant emission increase to avoid NSR, and can then avoid tracking the actual emission increase as a result of the changes by "projecting" that the Step 1 net emissions change would be less than 50 percent of the significant emissions increase level. These commenters asserted that the Administrator's directive that the EPA not question a source's NSR calculations (except in cases of "clear error"), referring to the December 2017 APTA Memorandum, means there is little chance that facilities' calculations will be audited and even less chance that the EPA will be able to check the actual emission increases resulting from changes.

The EPA agrees with the commenters that concluded that the regulations at 40 CFR 52.21(r)(6) are sufficient and appropriate to ensure that adequate records are maintained in circumstances where there is a reasonable possibility, as defined in the regulations, that a project determined not to constitute a major modification could result in a significant emissions increase. Those provisions apply equally to projects that trigger the reasonable possibility criteria, regardless of whether those projects include only increases, or increases and decreases in emissions, consistent with the clarifications in this final rule. We also agree that other records required to be maintained and reported under CAA programs will support compliance with the NSR applicability regulations and enforcement of those regulations as necessary. In imposing reasonable possibility recordkeeping requirements, the EPA "strove for a balance between ease of enforcement and avoidance of requirements that would be unnecessary or unduly burdensome on reviewing authorities or the regulated community." [99] Beyond alleging potential NSR circumvention, the commenters who oppose the use of the reasonable possibility provisions did not provide any persuasive rationale for

[99] 72 FR 72607, at 72610 (December 21, 2007). The "reasonable possibility" provisions of the existing regulations are currently in litigation. *State of New Jersey* v. *EPA*. No. 08–1065 (D.C. Cir.).

treating emissions increases and decreases differently for purposes of tracking emissions under those requirements. Since projected actual emissions must be based on all relevant information, sources may not arbitrarily project emissions below the applicability levels for these recordkeeping, monitoring, and reporting requirements.

We agree that in many or most cases, projects that involve both increases and decreases in emissions in Step 1 that do not trigger the reasonable possibility provisions will be subject to minor NSR permitting requirements. As such, records of the project activities, the emissions increases and any emissions decreases associated with those activities, the applicability test and the corresponding emissions calculations should be available or made available for review as part of the permit application and permit records for the project, which include the permit terms.

The EPA, however, disagrees that the "reasonable possibility" provisions at 40 CFR 52.21(r)(6) are insufficient to guard against NSR circumvention as a result of considering emissions increases and decreases in Step 1 and that reliance on those provisions would complicate enforcement and/or place undue burden on reviewing authorities for the reasons cited. First, as explained in Section III.B.4 of this final rule preamble, applying the EPA's 2018 final action on project aggregation interpretation and policy makes clear that any decreases from activities that are accounted for in Step 1 should be "substantially related" to any increases from activities that are part of the same project, meaning that those decreases in fact result from the project. Second, manipulating NSR major modification applicability calculations to circumvent NSR and/or avoid the "reasonable possibility" requirements in the regulations could subject a source to the NSR requirements, substantial civil penalties, and/or criminal liability. The regulations provide that "[r]egardless of any such preconstruction projections, a major modification results if the project causes a significant emissions increase and a significant net emissions increase." [100] Thus, if any emissions decreases are overstated, and/or any increases understated, such that the emissions projection at the time shows a source is not subject to NSR or the reasonable possibility requirements, the source will be subject to NSR if and when the project actually results in a major modification. Finally, and as stated previously, we do not agree that

the December 2017 APTA Memorandum will have any effect on third-party enforcement of the major NSR program. Nothing in this final rule changes the enforcement provisions available under the CAA to enforce the major NSR permitting requirements nor the ability of third parties to alert the EPA if they suspect that a source has improperly avoided the major NSR permitting requirements.

Other commenters challenged the EPA's reference to the reasonable possibility standard in the proposal on procedural grounds. These commenters stated that the reasonable possibility provisions are not only insufficient, but that they are "arbitrary and capricious" because the EPA failed in the proposal of this rule to specify how the provisions of 40 CFR 52.21(r)(6) are applicable to the consideration of emissions increases and decreases in Step 1 project emissions accounting. One commenter added that "at the outset, depending on how 'the project' is defined by the source operator, the plain text of [40 CFR 52.21(r)(6)], on its face, does not apply to emissions decreases."

The EPA disagrees with these commenters. The requirements of 40 CFR 52.21(r)(6) apply when there is a reasonable possibility that the project could result in a significant emissions increase and that those units are part of the project (i.e., their emissions "could be affected" by the project). While practically-speaking this would only apply to a project resulting in an overall increase in emissions because an overall decrease would clearly not have a reasonable possibility of triggering NSR, this does not mean that decreases cannot be considered when determining whether a project would result in an overall increase sufficient to trigger these requirements. When the reasonable possibility criteria in subparagraph (r)(6)(vi) are triggered by an overall increase, specific pre- and post-project recordkeeping, monitoring and reporting requirements in paragraph (r)(6) must be met, as described previously.

Based on the regulations themselves and the comments received, the EPA is concluding that the provisions of 40 CFR 52.21(r)(6) are sufficient for purposes of enforcing the NSR major modification applicability requirements including the clarifying revisions to those applicability requirements in this final rule.

6. Considering Emissions Decreases in Step 1 for Delegated and SIP-Approved Programs

In the proposal, we indicated that if this rule was finalized, any revisions to the regulations at 40 CFR 52.21 would apply to the EPA and reviewing authorities that have been delegated federal authority by the EPA to issue PSD permits on behalf of the EPA (via a delegation agreement with an EPA Regional Office).[101] The EPA also indicated that for state and local air agencies that implement the NSR program through EPA-approved SIPs,[102] the EPA also proposed to revise the regulations for approval of such programs (40 CFR 51.165 and 40 CFR 51.166) to be consistent with the proposed revisions to 40 CFR 52.21(a)(2)(iv).[103] For these SIP-approved programs, the EPA also indicated that if the EPA were to finalize the clarifications being proposed, reviewing authorities may not need to revise their state regulations and submit SIP revisions if the current NSR major modification applicability provisions in those regulations can be interpreted to allow for project emissions accounting or if those state and local air agencies incorporate the federal NSR regulations by reference without a date restriction. Lastly, the EPA mentioned that it was currently aware of a few states and local programs where the applicable SIP-approved regulations expressly preclude project emissions accounting. Thus, we requested comment on whether the EPA should determine that the proposed revisions to 40 CFR 51.165(a)(2)(ii)(F) and (G) and 40 CFR 51.166(a)(7)(iv)(f) and (g) constitute minimum program elements that must be included in order for state and local agency programs implementing part C or part D to be approvable under the SIP.[104]

Commenters expressed various positions regarding whether the proposed revisions should constitute minimum program elements that must be included for state and local programs implementing parts C or D of Title I of

---

[100] 40 CFR 52.21(a)(2)(iv)(b).

[101] There are currently 7 states that have full or partial delegation of authority to issue PSD permits on behalf of the EPA.

[102] The applicable regulations for state and local air agencies that implement the NSR program through the EPA-approved SIPs include 40 CFR 51.165(2)(ii)(F) and (G); to 40 CFR 51.166(a)(7)(iv)(f) and (g). Any references to SIP-approved plans also refer to the plans submitted by local air agencies to the EPA for approval.

[103] Supra n. 03. As indicated in footnote n. 03, the revisions being finalized in this action also apply to Appendix S of part 51.

[104] Such a determination was made with respect to the NSR regulatory revisions the EPA made in 2002. 67 FR 80185, at 80240 (December 31, 2002).

the CAA to be approvable under a SIP.[105] A few commenters stated that this final rule should constitute minimum program elements that must be included in an EPA-approved SIP on the basis that the changes in this final rule are clarifications of the regulations adopted by the 2002 NSR Reform Rule. Another one of these commenters stated that requiring the proposed rule revisions to be minimum program elements for programs implementing part C or part D to be approvable under a SIP would ensure national consistency.

Various commenters, however, opposed the concept of making project emissions accounting a minimum program element for programs implementing part C or part D to be approvable under a SIP. Some of these commenters noted that under section 116 of the CAA, states can adopt SIP provisions that are more stringent than those required by the EPA's regulations. A couple of commenters added that requiring the implementation of project emissions accounting would run afoul of the sovereign authority of state governments.

After reviewing the comments received on this matter, the EPA has determined that the revisions to the regulations at 40 CFR 52.21 adopted in this final rule apply to the EPA and reviewing authorities that have been delegated federal authority from the EPA to issue major NSR permits on behalf of the EPA.[106] For state and local air agencies that implement the NSR program through EPA-approved SIPs, the EPA agrees with those commenters who argued that section 116 of the CAA allows these states and local air agencies to adopt more stringent SIP emission control requirements than required by the EPA's regulations.[107] Thus, the EPA is concluding that reviewing authorities that do not allow for project emissions accounting have applicability requirements that are at least as stringent as those required by the Act or the EPA's implementing regulations and, therefore, are not required to submit SIP revisions or stringency determinations to the EPA as a result of this action. This is because sources that are not allowed to use project emissions accounting may be subject to major NSR

even where a more-complete accounting of their emissions (*i.e.*, accounting of both emissions increases and decreases in Step 1 of the NSR major modification applicability test) would reveal that the project produced either an emissions decrease or a *de minimis* increase in emissions.

For SIPs approved under 40 CFR 51.166, the EPA has determined that conforming state/local plan revisions will not be subject to the deadline by which a reviewing authority is typically required to revise its implementation plan in response to amendments to the federal regulations.[108] Similarly, because the EPA views not allowing project emissions accounting to be at least as stringent as the requirements under 40 CFR 51.165, plans already approved under the current version of that section of the CFR will continue to be at least as stringent as the revised regulations and states and local air agencies will not need to submit revisions to already approved plans.[109]

### 7. Environmental and Economic Impact Considerations of Project Emissions Accounting

Two commenters asserted that the EPA was required to evaluate the environmental impacts of the proposed rule. One of these commenters argued that the EPA's lack of permitting data does not excuse the agency from conducting an analysis of the environmental impacts of the rule and that the EPA must use data from its own records and/or request data from state and local reviewing authorities to conduct such an analysis.

In the proposal preamble we indicated that we were unable at this time to estimate any potential environmental or economic impacts or changes in emissions associated with project emissions accounting because most NSR permits are issued by state and local air agencies and the EPA generally lacks information on the economic and environmental impacts of NSR permits. NSR permitting is a case-by-case process and sources make permitting decisions based on many factors. Furthermore, neither the EPA nor state and local reviewing authorities have access to any records of decisions made by sources which would indicate whether a project was or was not undertaken in view of the unavailability of project emissions accounting. We do not, for example,

require the reporting of any information concerning projects that are not pursued. Thus, in the proposal, we asked that commenters provide information on particular examples that could assist the EPA in providing some level of qualitative impacts analysis when finalizing this action.

In response to this solicitation, a few commenters noted that project emissions accounting is consistent with the CAA and with the congressional intent that the PSD and NNSR preconstruction permitting programs only apply when an existing source undertakes a project resulting in a significant increase in emissions. Several commenters, however, indicated that this final rule would result in negative environmental impacts by allowing sources to forgo major NSR permitting and the associated BACT or LAER requirement. Commenters stated that the emissions increases that would result from this final rule would contravene the purpose of the NSR program to require permits where changes at industrial facilities might increase air pollution. Other commenters noted that this final rule may have the potential of reducing overall emissions by removing a disincentive for sources seeking to undertake projects that would improve the energy efficiency of their operations.

After consideration of the comments received on this matter, we would like to reiterate that this final rule will not allow projects that themselves result in a significant emissions increase (*i.e.*, an increase greater than *de minimis* levels) and a significant net emissions increase to proceed without obtaining a major NSR permit. Rather, the final rule merely clarifies the NSR major modification applicability test to allow for a more accurate accounting of a project's impacts on air quality to the surrounding area by allowing a source to consider all changes in emissions— both increase and decreases—that result from a project in its calculation of the proposed project emissions. This is consistent, rather than contrary, to the congressional intent for the NSR program. Additionally, despite a commenter's assertion that this rule will allow sources to emit more by circumventing the BACT or LAER requirements, there is no evidence to suggest that the final rule will result in greater overall emissions increases than would otherwise be allowed from projects affected by the rule. For example, as the EPA noted in the proposed rule and as indicated by some commenters, it is equally conceivable that accounting for emissions decreases in Step 1 of the NSR major modification

---

[105] A SIP refers to an implementation plan submitted by a State to the EPA for approval. In this preamble, this term also refers to implementation plans submitted by local agencies.

[106] PSD program provisions have been delegated to reviewing authorities. Reviewing authorities in Indian country can request delegation of the major NA NSR provisions, but to date, none have done so.

[107] *Union Electric* v. *EPA*, 427 U.S. 246,263–264 (1976).

[108] 40 CFR 51.166(a)(6). The EPA's view is that no state is "required to revise its implementation plan by reason of" the amendment to 51.166 reflected in this final rule.

[109] 40 CFR 51.165(a)(1), (a)(2)(ii), and (a)(6) (allowing deviations only when at least as stringent).

applicability test will incentivize sources to undertake energy efficiency and/or other environmentally beneficial projects that they might otherwise have forgone. In addition, just because a project might result in a significant increase in emissions in Step 1 without the accounting for emissions decreases from the project, does not mean that the project would be subject to the BACT or LAER requirements. Such a project could still result in a net emissions decrease, or a net emissions increase that is not significant and does not trigger the major NSR permitting requirements. It is therefore improper to compare the use of project emissions accounting to the application of BACT or LAER. These outcomes are not an either-or proposition for a project that would not result in a significant emissions increase when accounting for decreases but would result in a significant emissions increase when decreases from the project are not considered in Step 1.

Several commenters submitted examples of actual projects that involved emissions decreases that would be more likely to proceed with the availability of project emissions accounting. These examples included replacement projects, projects involving the installation of control equipment, and fuel changes—projects that may result in a reduction of overall emissions but may be forgone if decreases associated with the projects are not considered. For example commenters mentioned that, a source may forgo, the installation of an end-of-life replacement to avoid NSR permitting since the emissions would appear as an emissions increase in Step 1 of the applicability determination even when the replacement would have reduced the potential emissions. While the new unit in general may be larger in capacity, their design and material changes generally entail increased efficiency and lower emissions. Newer units may also generally contain inherent emissions controls (e.g., heaters equipped with low $NO_X$ burners) that also lower the source's overall emissions. If the source can count emissions decreases from this project under project emissions accounting, then the source may be more likely to undertake the project, or the source owner might expedite it. However, the project may be foregone if the emission decreases could only be considered as part of a more complex Step 2 contemporaneous netting analysis. Furthermore, commenters noted that proposing a project (e.g. expansion that results in increased tank

throughput and cooling capacity) may also include the installation of emissions control equipment such as installing a geodesic dome to an external floating roof tank to control volatile organic content (VOC) emissions, retrofitting a cooling water tower with drift eliminators to reduce particulate matter emissions; and/or installing dual-seal pumps to reduce fugitive VOC emissions. If the consideration of emissions decreases as part of project emissions accounting at Step 1 were not available, a project that also involves the installation of emissions control equipment that reduces overall emissions could be foregone due to the complexities of Step 2 contemporaneous netting. Project emissions accounting may also expedite the environmental benefits associated with converting a unit to a lesser-emitting fuel source. For example, when emissions decreases are considered at Step 1, a source owner or operator proposing a project that replaces existing oil-fired boilers with lesser-emitting natural gas boilers might not trigger permitting at Step 1, but it would reduce its overall emissions. If project emissions accounting were not available, the source would likely trigger Step 1 and also undergo the Step 2 analysis to determine if it needs a major modification permit for its proposed project. Under Step 2, the source owner or operator would be required to consider all other contemporaneous emissions increases and decreases from the project, usually within a five-year time period, even though the project itself would have already resulted in a decrease in the actual emissions from the facility. Therefore, a source may decide to forgo transitioning to a lesser-emitting fuel to avoid going through some of the complexities of Step 2 contemporaneous netting or potentially having to receive a major NSR permit for a project that decreases emissions. The Response to Comments document for this final action contains more details about these projects.[110]

Based on the information and examples provided, the EPA believes that considering the full scope of the impact of a project ensures that congressional intent for the NSR program, to ensure environmental protection while allowing for economic growth, is met. That is to say, this rule provides more clarity to sources and reviewing authorities applying the NSR applicability test and potentially

reduces the permitting burden for sources undertaking economically-beneficial projects that do not produce a greater than de minimis increase in emissions. The EPA has provided a more complete discussion of the potential environmental impacts of the rule as well as the difficulties of accurately projecting such impacts in the Environmental Justice Considerations Section of this preamble and the same analysis is provided in the Response to Comments document for this final action.

## IV. Environmental Justice Considerations

In the proposal, the EPA stated that we did not believe that the proposed revisions to the NSR major modification applicability regulations would have any effect on environmental justice communities because the EPA's NSR regulations in place since the 2002 NSR Reform Rule was finalized to allow project emissions accounting. As such, the EPA expected no increase in the permitting burden for sources, reviewing authorities or environmental justice communities after finalization of the proposed rule revisions.

Nevertheless, one commenter argued that because the proposed revisions would alter how major modifications are determined under the NSR program, they would result in fewer modifications being subject to major NSR and, therefore, the environmental justice impacts of the rule must be considered accordingly. The commenter added that it is clear that the intention of this rulemaking is to reduce the number of projects that are considered major modifications under NSR and this will reduce public health and welfare protection. According to the commenter, this is because fewer facilities will be required to ensure that the changes they are making are protective of ambient air quality and fewer facilities will be required to install pollution controls on new or modified units because their changes will not trigger NSR. Moreover, the commenter stated that environmental justice initiatives stem from the fact that facilities with the worst environmental impact are more likely to be located in areas with higher poverty rates, communities of color, or tribal lands.

We continue to believe that these rule revisions will not impact environmental justice communities in a manner that is different than any impact this rule might have in any other area of the country. As we explained in the proposal preamble, and as stated elsewhere in this preamble, we interpret our regulations to already allow for

---

[110] These comments can be found in Section 4.0 and 5.0 of the Response to Comments document for this action.

project emissions accounting even in the absence of this rule. This rulemaking will only serve to provide greater clarity with respect to the major NSR applicability procedures and, thus, will incentivize states to implement project emissions accounting at their discretion. This improved clarity itself confers potential benefits to environmental justice communities by removing a disincentive to the implementation of energy efficiency improvements and other environmentally beneficial projects at industrial sources for sources that might have forgone these projects due to the complexity of the Step 2 contemporaneous netting analysis.

However, to aid stakeholders in their assessment of the potential impacts of this action and to be responsive to the comments received, we did perform a qualitative analysis of a few examples of actual projects that may reduce air emissions due to the availability of project emissions accounting at Step 1 of the NSR major modification applicability test. These examples are based on the comments received during the public comment period for this final action, are included as part of the Response to Comments document for this final action and are also summarized in the next few paragraphs of this section of the preamble. This analysis, however, does not provide a qualitative estimate of the potential environmental impacts of accounting for emissions decreases at Step 1 of the NSR major modification applicability test since the commenters did not provide information of any potential emissions increases or decreases that would have occurred in these examples based on the availability of project emissions accounting at Step 1.[111]

Examples of replacement projects: A source may forgo, the installation of an end-of-life replacement to avoid NSR permitting since the emissions would appear as an emissions increase in Step 1 of the applicability determination even when the replacement would have reduced the potential emissions. While

the new unit in general may be larger in capacity, their design and material changes generally entail increased efficiency and lower emissions. Newer units may also generally contain inherent emissions controls (*e.g.,* heaters equipped with low $NO_X$ burners) that also lower the source's overall emissions. If the source can count emissions decreases from this project under project emissions accounting, then the source may be more likely to undertake the project, or the source owner might expedite it. However, the project may be foregone if the emission decreases could only be considered as part of a more complex Step 2 contemporaneous netting analysis.

Examples of projects involving the installation of emissions control equipment: Proposing a project (*e.g.* expansion that results in increased tank throughput and cooling capacity) may also include the installation of emissions control equipment such as installing a geodesic dome to an external floating roof tank to control volatile organic content (VOC) emissions, retrofitting a cooling water tower with drift eliminators to reduce particulate matter emissions; and/or installing dual-seal pumps to reduce fugitive VOC emissions. If the consideration of emissions decreases as part of project emissions accounting at Step 1 were not available, a project that also involves the installation of emissions control equipment that reduces overall emissions could be foregone due to the complexities of Step 2 contemporaneous netting.

Examples of projects involving fuel changes: Project emissions accounting may also expedite the environmental benefits associated with converting a unit to a lesser-emitting fuel source. For example, when emissions decreases are considered at Step 1, a source owner or operator proposing a project that replaces existing oil-fired boilers with lesser-emitting natural gas boilers might not trigger permitting at Step 1, but it would reduce its overall emissions. If project emissions accounting were not available, the source would likely trigger Step 1 and also undergo the Step 2 analysis to determine if it needs a major modification permit for its proposed project. Under Step 2, the source owner or operator would be required to consider all other contemporaneous emissions increases and decreases from the project, usually within a five-year time period, even though the project itself would have already resulted in a decrease in the actual emissions from the facility. Therefore, a source may decide to forgo

transitioning to a lesser-emitting fuel to avoid going through some of the complexities of Step 2 contemporaneous netting or potentially having to receive a major NSR permit for a project that decreases emissions.

While this rule may allow projects that produce an overall *de minimis* increase in emissions to forgo the major NSR permitting process, the EPA believes that it is equally conceivable that the rule will create an incentive for sources to adopt emissions-reducing processes and technology (that may represent control beyond what would be required for BACT or LAER) that they would not have otherwise adopted if project emissions accounting were not available. At the very least, the final rule may expedite efficiency-enhancing projects that would have otherwise require a more complex and potentially burdensome Step 2 analysis to determine that the efficiency-enhancing projects would have "netted out" or not be subject to major NSR permitting. These efficiency improvements may have collateral benefits.

The EPA also notes that projects at existing major stationary sources that are determined not to trigger major NSR permitting requirements, will, in many or most cases, be subject to minor NSR permitting requirements, regardless of the accounting procedures used in determining major NSR applicability. Minor NSR permit actions require the opportunity for public comment,[112] which provides an opportunity for stakeholders to raise potential environmental justice concerns based on the characteristics of the project and the location of the project relative to any environmental justice communities within the vicinity of the source.

Furthermore, while the EPA shares the commenter's concerns regarding the potential impacts of air pollution on environmental justice communities, the EPA notes that the NSR program is but one of many programs that address air pollution under the Clean Air Act.

In addition, and as noted elsewhere in this preamble and in the Response to Comments document for this final action, the EPA views project emissions accounting as being fully consistent with the Act and the 2002 NSR Reform Rule. Allowing for project emissions accounting will ensure that a project that itself results in a *de minimis* increase in emissions, or even a decrease in emissions, will not be subject to major NSR. As stated previously, the NSR program was designed to ensure environmental protection while allowing for economic

---

[111] In its preamble to the proposal, the EPA also highlighted an example of a source that could have saved four additional months of the overall permitting process timeline and $80,000 had it had the opportunity to use project emissions accounting, but there were no emissions implications tied to this example. Thus, it is conceivable that the permitted source was not beholden to BACT/LAER emissions reductions or that the source, had it been able to institute the project earlier, could have instituted emissions reductions to offset any emissions reductions that may have been attributed to the resulting BACT/LAER requirements (assuming such requirements were imposed on the source), while reducing the permitting time burden and avoiding triggering the major NSR permitting requirements.

[112] 40 CFR 51.161.

growth by managing increases in emissions from economic development. The EPA believes that project emissions accounting properly balances those interests. In addition, as noted elsewhere, reviewing authorities have the discretion to not allow project emissions accounting and to create or maintain requirements under their SIPs that are at least as stringent as the requirements specified in the EPA's regulations.

Finally, current analytical tools and methods do not allow for a more quantitative analysis of environmental and economic costs associated with the NSR applicability test at this time. However, the EPA will consider whether any newly developed analytical tools or methods would allow for such a quantitative analysis in connection with some future NSR regulatory action.

## V. Statutory and Executive Order Reviews

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is a significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review since it raises policy issues arising from the President's priorities. Any changes made in response to OMB recommendations have been documented in the docket as required by section 6(a)(3)(E) of Executive Order 12866.

### B. Executive Order 13771: Reducing Regulations and Controlling Regulatory Costs

This action is considered an Executive Order 13771 deregulatory action. Before completing this rule, the EPA interpreted its NSR regulations to allow for project emissions accounting. To the extent the clarifications included in this rule influence the actions of sources and reviewing authorities to increase the use of project emissions accounting, this final rule will provide burden reduction.

### C. Paperwork Reduction Act (PRA)

This action does not impose any new information collection burden under the PRA. OMB has previously approved the information collection activities contained in the existing regulations and has assigned OMB control numbers 2060–0003 for the PSD and NNSR permit programs. The burden associated with obtaining an NSR permit for a major stationary source undergoing a major modification is already accounted

for under the approved information collection requests.

### D. Regulatory Flexibility Act (RFA)

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. This action will not impose any requirements on small entities. Before this rule was finalized, the EPA interpreted its NSR regulations to allow for project emissions accounting and, as such, no increased or decreased burden is expected for sources or reviewing authorities after the finalization of the clarifications included in this rule. Furthermore, the EPA is not making the regulatory changes in this final rule mandatory for adoption and, as such, only major stationary sources located in areas where reviewing authorities decide to newly implement project emissions accounting might see a burden reduction if the consideration of emissions increases and decreases in Step 1 does not trigger further permitting requirements that may have otherwise required these major stationary sources to obtain a major NSR permit.

### E. Unfunded Mandates Reform Act (UMRA)

This action does not contain any unfunded federal mandate as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments or the private sector.

### F. Executive Order 13132: Federalism

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

### G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

This action does not have tribal implications as specified in Executive Order 13175. The EPA's NSR major modification applicability regulations in place after the 2002 NSR Reform Rule allow for the consideration of emissions increases and decreases in Step 1 of the NSR major modification applicability test and, as such, the clarifying revisions being proposed in this rule will not have exclusive tribal implications. Furthermore, the EPA is currently the reviewing authority for PSD and NNSR permits issued in tribal lands and, as

such, the clarifying revisions being proposed will not impose direct burdens on tribal authorities. Thus, Executive Order 13175 does not apply to this action.

### H. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks

The EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive Order. This action is not subject to Executive Order 13045 because it does not concern an environmental health risk or safety risk.

### I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use

This action is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution or use of energy. In addition, and before this rule was finalized, the EPA interpreted its NSR regulations to allow for project emissions accounting and, as such, no increased burden is expected for sources or reviewing authorities after the finalization of the clarifications included in this rule. Furthermore, the EPA is not making the regulatory changes in this final rule mandatory for adoption and, as such, only major stationary sources located in areas where state and local reviewing authorities decide to newly implement project emissions accounting might see a burden reduction if the consideration of emissions increases and decreases in Step 1 does not trigger further permitting requirements that may have otherwise required these major stationary sources to obtain a major NSR permit.

### J. National Technology Transfer and Advancement Act

This rulemaking does not involve technical standards.

### K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

The EPA believes that this action does not have disproportionately high and adverse human health or environmental effects on minority populations, low-income populations and/or indigenous peoples, as specified in Executive Order 12898 (59 FR 7629, February 16, 1994).

Before this rule was finalized, the EPA interpreted its NSR regulations to allow for project emissions accounting and this action only finalized clarifying revisions to the NSR major modification applicability regulations. Further information on the Environmental Justice considerations are included in Section IV of this final action's preamble.

*L. Congressional Review Act (CRA)*

This action is subject to the CRA, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a "major rule" as defined by 5 U.S.C. 804(2).

*M. Judicial Review*

Under CAA section 307(b)(1), petitions for judicial review of any nationally applicable regulation, or any action the Administrator "finds and publishes" as based on a determination of nationwide scope or effect must be filed in the United States Court of Appeals for the District of Columbia Circuit within 60 days of the date the promulgation, approval, or action appears in the **Federal Register**.[113] This action is nationally applicable, as it clarifies the applicability provisions that apply to Step 1 of the NSR major modification applicability test in 40 CFR 51.165, 51.166, 52, and appendix S to part 51. As a result, petitions for review of this final action must be filed in the United States Court of Appeals for the District of Columbia Circuit by January 25, 2021. Filing a petition for reconsideration by the Administrator of this final action does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review must be filed and shall not postpone the effectiveness of this action.[114]

## VI. Statutory Authority

The statutory authority for this action is provided by 42 U.S.C. 7401, *et seq.*

## List of Subjects

*40 CFR Part 51*

Environmental protection, Air pollution control.

*40 CFR Part 52*

Environmental protection, Air pollution control, Incorporation by reference.

**Andrew Wheeler,**

*Administrator.*

For the reasons stated in the preamble, title 40, chapter I of the Code of Federal Regulations is amended as follows:

## PART 51—REQUIREMENTS FOR PREPARATION, ADOPTION, AND SUBMITTAL OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 51 continues to read as follows:

**Authority:** 23 U.S.C. 101; 42 U.S.C. 7401–7671q.

## Subpart I—Review of New Sources and Modifications

■ 2. Section 51.165 is amended by revising paragraph (a)(2)(ii)(F) and adding paragraph (G) to read as follows:

§ 51.165   Permit requirements.

(a) * * *

(2) * * *

(ii) * * *

(F) *Hybrid test for projects that involve multiple types of emissions units.* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference for all emissions units, using the method specified in paragraphs (a)(2)(ii)(C) through (D) of this section as applicable with respect to each emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (a)(1)(x) of this section).

(G) The "sum of the difference" as used in paragraphs (C), (D) and (F) of this section shall include both increases and decreases in emissions calculated in accordance with those paragraphs.

* * * * *

■ 3. Section 51.166 is amended by revising paragraph (a)(7)(iv)(*f*) and adding paragraph (*g*) to read as follows:

§ 51.166   Prevention of significant deterioration of air quality.

(a) * * *

(7) * * *

(iv) * * *

(*f*) *Hybrid test for projects that involve multiple types of emissions units.* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference for all emissions units, using the method specified in paragraphs (a)(7)(iv)(*c*) through (*d*) of this section as applicable with respect to each emissions unit.

equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(*g*) The "sum of the difference" as used in paragraphs (*c*), (*d*) and (*f*) of this section shall include both increases and decreases in emissions calculated in accordance with those paragraphs.

* * * * *

## Subpart CC—Provisions for Implementation of the 2015 Ozone National Ambient Air Quality Standards

■ 4. Appendix S to part 51 is amended by revising section IV.I.1.(v) and adding paragraph (vi) to read as follows:

## Appendix S to Part 51—Emission Offset Interpretative Ruling

* * * * *

IV. Sources That Would Locate in a Designated Nonattainment Area

* * * * *

I. *Applicability procedures.*

1. * * *

(v) *Hybrid test for projects that involve multiple types of emissions units.* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference for all emissions units, using the method specified in paragraphs IV.I.1(iii) through (iv) of this Ruling as applicable with respect to each emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph II.A.10 of this Ruling).

(vi) The "sum of the difference" as used in paragraphs (iii), (iv) and (v) of this section shall include both increases and decreases in emissions calculated in accordance with those paragraphs.

* * * * *

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 5. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

## Subpart A—General Provisions

■ 6. Section 52.21 is amended by revising paragraph (a)(2)(iv)(*f*) and adding paragraph (*g*) to read as follows:

§ 52.21   Prevention of significant deterioration of air quality.

(a) * * *

(2) * * *

(iv) * * *

(*f*) *Hybrid test for projects that involve multiple types of emissions units.* A significant emissions increase of a regulated NSR pollutant is projected to occur if the sum of the difference for all emissions units, using the method specified in paragraphs (a)(2)(iv)(*c*)

---

[113] 42 U.S.C. 7607(b)(1).

[114] 42 U.S.C. 7607(d)(7)(B).

through (*d*) of this section as applicable with respect to each emissions unit, equals or exceeds the significant amount for that pollutant (as defined in paragraph (b)(23) of this section).

(*g*) The "sum of the difference" as used in paragraphs (*c*), (*d*) and (*f*) of this section shall include both increases and decreases in emissions calculated in accordance with those paragraphs.

\* \* \* \* \*

[FR Doc. 2020–23784 Filed 11–23–20; 8:45 am]

BILLING CODE 6560-**50**-P

---

# DEPARTMENT OF TRANSPORTATION

## Federal Motor Carrier Safety Administration

## 49 CFR Part 395

**[Docket No. FMCSA–2018–0348]**

**RIN 2126–AC24**

## Hours of Service of Drivers; Definition of Agricultural Commodity

**AGENCY:** Federal Motor Carrier Safety Administration (FMCSA), DOT.

**ACTION:** Interim final rule with request for comment.

**SUMMARY:** FMCSA clarifies the definition of the terms "any agricultural commodity," "livestock," and "non-processed food," as the terms are used in the definition of "agricultural commodity" for the purposes of the Agency's "Hours of Service (HOS) of Drivers" regulations. Under current regulations, drivers transporting agricultural commodities, including livestock, from the source of the commodities to a location within 150 air miles of the source, during harvest and planting seasons as defined by each State, are exempt from the HOS requirements. Furthermore, the HOS requirement for a 30-minute rest break does not apply to drivers transporting livestock in interstate commerce while the livestock are on the commercial motor vehicle. This interim final rule (IFR) clarifies the meaning of these existing definitional terms to ensure that the HOS exemptions are utilized as Congress intended.

**DATES:** This IFR is effective December 9, 2020. You must submit comments on or before December 24, 2020.

Petitions for Reconsideration of this IFR must be submitted to the FMCSA Administrator no later than December 24, 2020.

**ADDRESSES:** You may submit comments identified by docket number FMCSA–2018–0348 using any one of the following methods:

• *Federal eRulemaking Portal:* Go to *http://www.regulations.gov/ #!docketDetail;D=FMCSA-2018-0348.* Follow the online instructions for submitting comments.

• Fax: (202) 493–2251.

• *Mail:* Dockets Operations, U.S. Department of Transportation, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590–0001.

• *Hand delivery:* Same as mail address above, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Mr. Richard Clemente, Driver and Carrier Operations Division, FMCSA, 1200 New Jersey Avenue SE, Washington, DC 20590–0001, (202) 366–4325, *MCPSD@ dot.gov.* If you have questions on viewing or submitting material to the docket, contact Dockets Operations, (202) 366–9826.

**SUPPLEMENTARY INFORMATION:** This IFR is organized as follows:

I. Public Participation and Request for Comments
   A. Submitting Comments
   B. Viewing Comments and Documents
   C. Privacy Act
II. Executive Summary
III. Legal Basis for the Rulemaking
IV. Background
V. Discussion of Interim Final Rule
VI. Questions
VII. International Impacts
VIII. Section-by-Section Analysis
IX. Regulatory Analyses
   A. E.O. 12866 (Regulatory Planning and Review), E.O. 13563 (Improving Regulation and Regulatory Review), and DOT Regulations
   B. E.O.13771 (Reducing Regulation and Controlling Regulatory Costs)
   C. Congressional Review Act
   D. Regulatory Flexibility Act (Small Entities)
   E. Assistance for Small Entities
   F. Unfunded Mandates Reform Act of 1995
   G. Paperwork Reduction Act
   H. E.O. 13132 (Federalism)
   I. Privacy
   J. E.O. 13175 (Indian Tribal Governments)
   K. Environment

# I. Public Participation and Request for Comments

## A. Submitting Comments

If you submit a comment, please include the docket number for this IFR (FMCSA–2018–0348), indicate the specific section of this document to which your comment applies, and provide a reason for each suggestion or recommendation. You may submit your comments and material online or by fax, mail, or hand delivery, but please use only one of these means. FMCSA recommends that you include your

name and a mailing address, an email address, or a phone number in the body of your document so that FMCSA can contact you if there are questions regarding your submission.

To submit your comment online, go to: *http://www.regulations.gov/ #!docketDetail;D=FMCSA-2018-0348,* click on the "Comment Now!" button, and type your comment into the text box on the following screen. Choose whether you are submitting your comment as an individual or on behalf of a third party and then submit.

If you submit your comments by mail or hand delivery, submit them in an unbound format, no larger than 8½ by 11 inches, suitable for copying and electronic filing. If you submit comments by mail and would like to know that they reached the facility, please enclose a stamped, self-addressed postcard or envelope.

FMCSA will consider all comments and material received during the comment period and may change this IFR based on your comments. FMCSA may issue a final rule at any time after the close of the comment period.

Confidential Business Information

Confidential Business Information (CBI) is commercial or financial information that is both customarily and actually treated as private by its owner. Under the Freedom of Information Act (FOIA, 5 U.S.C. 552), CBI is exempt from public disclosure. If your comments responsive to this IFR contain commercial or financial information that is customarily treated as private, that you actually treat as private, and that is relevant or responsive to this IFR, it is important that you clearly designate the submitted comments as CBI. Please mark each page of your submission that constitutes CBI as "PROPIN" to indicate it contains proprietary information. FMCSA will treat such marked submissions as confidential under the FOIA, and they will not be placed in the public docket of this IFR. Submissions containing CBI should be sent to Mr. Brian Dahlin, Chief, Regulatory Analysis Division, Federal Motor Carrier Safety Administration, 1200 New Jersey Avenue SE, Washington DC 20590. Any comments that FMCSA receives which are not specifically designated as CBI will be placed in the public docket for this rulemaking.

## B. Viewing Comments and Documents

· To view comments, as well as any documents mentioned in this preamble as being available in the docket, go to *http://www.regulations.gov/ #!docketDetail;D=FMCSA-2018-0348*

## CERTIFICATE OF SERVICE

I hereby certify that pursuant to D.C. Circuit Rule 15(a), a true and correct

copy of the foregoing Petition for Review was served on January 19, 2021 by first

class mail, postage prepaid on the following:

Andrew Wheeler
U.S. Environmental Protection Agency
Office of the Administrator – 1101A
William Jefferson Clinton Federal Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

U.S. Environmental Protection Agency,
Office of General Counsel – 2310A
William Jefferson Clinton Federal Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Jeffrey A. Rosen
Acting Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530

/s/ Lisa Morelli
Lisa Morelli